ELLIS, Judge.
This suit involves an intersectional collision which occurred on January 14, 1956, at the intersection of Cherry and Bay Streets in the City of Amite, Parish of Tangipahoa, Louisiana. The only eye witnesses are the two drivers and their testimony is in direct conflict. The case was tried before a jury which rendered a judgment in favor of the plaintiff for the full limits of the policy, viz., $5,000, and it is from this judgment that the defendants have appealed, and the plaintiff-appellee has answered the appeal praying for an increase in the award.
The defendants-appellants complain of the jury verdict on three grounds, viz. That it was in error in finding the defendant, Rallie C. Edwins, guilty of any negligence, and that the said negligence was the proximate cause of the accident and in not finding that it was the plaintiff’s negligence which was the proximate cause of the accident, or that the plaintiff was guilty of such contributory negligence as to bar his recovery in this case, and second, that the verdict of the jury in awarding the plaintiff the sum of $5,000 for damages was excessive, and third, that the trial court was in error in requiring the defendant, Edwins, to testify as to how many prior accidents he had been in and that said testimony prejudiced the defendant before the jury to such an extent that if this court should not reverse the verdict, then the case should be remanded to the District Court for a new trial.
The collision occurred at an uncontrolled intersection, and is controlled by the provisions of LSA-R.S. 32:237, subd. A which provides that when two vehicles approach or enter an intersection at approximately the same time, the driver approaching from the right shall have the right of way.
It is conceded by the defendant-appellant that the plaintiff had the directional right of way, and that the plaintiff should recover unless the defendant could show that he was traveling at such an unlawful rate of speed or in such an unlawful manner that he forfeited same. The defendant contends that the plaintiff forfeited his legal right of way by driving his automobile at an execessive speed and that he failed to keep a proper lookout or that if he did look, he should have realized in time to avoid an accident that the inferior traffic would continue into the intersection and that he could not then safely proceed and lastly, that the defendant had preempted the intersection.
This case presents purely a question of fact which must be decided on the testimony of the two drivers, as they were the only eye witnesses, and the physical facts, which the jury resolved in favor of the *754 plaintiff, and unless manifestly, which is the same thing as clearly or obviously, wrong or in error, it will not be reversed.
This accident occurred during the day and the weather was clear and dry. The map and the photographs show that while this corner to the north of Cherry Street and the east of Bay Street cannot be strictly termed a blind corner, for it is shown that for a distance of approximately 70 feet north on Bay Street one can see a distance on Cherry Street from the intersection of approximately 30 to 35 feet, however, at a greater distance north on Bay Street vision is interfered with by a camphor tree, a live oak tree, evergreen shrubs, two feet high and four feet in diameter, crepe myrtle tree with limbs five feet high, evergreen shrub and that opposite the 92 foot mark is a four foot high hedge. It is possible to see in certain positions when traveling down Bay Street.behind these objects which would give a driver, such as plaintiff coming south, fleeting view of Cherry Street at a greater distance than 35 to 40 feet from the intersection. It is substantially plaintiffs story that on the Saturday of the accident he was traveling south on Bay Street at a speed of approximately 25 miles an hour and that when he got in the intersection he then saw the defendant’s car some 35 or 40 feet back on Cherry Street traveling toward the intersection which would be in a westerly direction, but that he was coming at such a rate of speed that he came on into the intersection and struck his car more or less broadside from the side of the left front fender down through to the door near its post, knocking his car in a southwesterly direction a distance of 50 feet, and estimated by other witnesses at as much as 70 feet, to a ditch which was running in an east and west direction at the rear of a vacant lot a distance of 52 feet south of the intersection in question. The car came to rest at this point.
The defendant Edwins testified that he was in the furniture business and on the day of the accident was collecting from his customers and had made three stops on Cherry Street just prior to the accident, the last being approximately one-half block from the intersection. He further testified with regard to the visibility at this intersection to the north of Bay Street, in part, as follows:
“ * * * I would say the vision on the corner, you can see around it, after you approach it about from about 40 feet from it the vision clears and — - maybe 50 feet from it, and I say Mr. Thompson’s car traveling right toward the intersection and I saw — I believe it was about a third of a block back or a little more, and I saw — I had plenty of time to go across and about that time I was just about stopped and I meandered on across the road, I was possibly at that time going I would say between 10 miles an hour — as I got into the intersection — all this happened very fast' — I saw him, I knew he was coming at me at least must have been 50 or 60 miles an hour and I slammed on the brakes. I didn’t exactly know whether to let the brakes up as I was hit tight in the middle and I was swerving the wheel and after that I — my opinion of it he hit me right in the front end and I just flopped right into the ditch which I was 10 or 12 or 14 feet from where the exact collis-sion occurred.”
In addition to the above the defendant stated that when he saw that plaintiff was going to hit him he swerved his car, meaning, turned it toward the left, which would cause it to go in a southwest direction, blew his horn, however, there is no other testimony to corroborate the horn blowing and that the last thing he remembered was looking straight “in the eyes” of the plaintiff and that the latter never did see the defendant until after the collision.
The physical facts and the testimony of most of the witnesses who examined the cars and the scene after the wreck preponderates in favor of the plaintiff’s state *755 ment that he was struck on the left side of his car and it left the imprint of the defendant’s headlight, rather than defendant’s statement that plaintiff struck the front end of his car. The defendant’s car, as a result of having turned just prior to the actual impact to the left, went across Bay Street in a southwesterly direction a distance of 20 feet and down in a rather deep ditch on the west side of Bay Street. The plaintiff testified that his automobile was knocked to the west and be that as it may, it is more than likely that he also turned to the left somewhat unconsciously in order to avoid the impact, and as a result he went in a southwesterly direction from SO to 75 feet, and the defendant contends, 90 feet, and ended up in a ditch which runs to the south of a vacant lot which joins the intersection. From the exhibits and the testimony it would appear that plaintiff’s car went a distance of approximately 60 or 70 feet, and there is no evidence that he ever applied his brakes, and for this reason the distance would not be indicative or proof of excessive speed on the part of the plaintiff. On the other hand, the damage done to the plaintiff’s car by the blow from the defendant’s car was estimated at more than $1,000 and was shown by testimony to have also bent the frame and caused extensive damage, which would indicate a speed. However, it is possible that neither one was speeding. Plaintiff’s statement that he pre-empted the intersection and at that time saw the defendant 30 or 40 feet back from the intersection, is evidently in error, however, in these cases the litigants are guessing at distances and such testimony must be considered in that light. The defendant stated when he was within 30 or 40 feet of the intersection he could see the plaintiff approximately one-third of the distance of the block to the north, however, there is no testimony as to the length of this block. There is no testimony in the record to show that the defendant ever looked again until he was in the intersection and the collision was unavoidable. Defendant was on the unfavored street and it was his duty when he arrived at the intersection to ascertain if he could safely proceed, and had he done this, under the self-evident facts, he would not have proceeded into the intersection for he would have realized that he could not, with reasonable safety, proceed and clear the superior lane of travel in which the plaintiff was approaching.
From a careful consideration of the record, the offerings, the physical facts and the evidence, we cannot say that the judgment rendered herein by the jury was manifestly erroneous. Defendant’s plea of excessive speed, or the last clear chance on the part of the plaintiff, is not substantiated by anything other than the testimony of the defendant, and the distance which the plaintiff’s car traveled after the impact. However, as previously stated there is no evidence of application of brakes and at 25 miles an hour a car would roll the distance which the plaintiff’s car traveled before coming to a stop.
Quantum
In detailing his injuries, plaintiff testified: “I have a muscle on the left side of my back in the rear bruised, pulled, my left arm and hand and my back were the severe part of the injuries.” Plaintiff on the date of the trial still contended that he was suffering or having trouble with his back, which was on June 4, 1957, approximately a year and a half after the accident. There is no testimony that plaintiff at the moment of the collision or immediately thereafter felt any pains or knew that he was injured, for he stated that he ran over to assist in first aid treatment to the defendant who was bleeding very badly from a wound of the head. We realize that the absence of any indication of pain or injury on the part of the plaintiff at that time might have been due to the excitement and nervous strain brought about by the collision.
The medical testimony consisted of that of Dr. Roy Rose of Amite, La., although plaintiff was examined by Dr. Bannerman of Baton Rouge. There 'is a statement in *756 the record that Dr. Bannerman was unable to be present at the trial, however, this does not excuse the plaintiff from obtaining his testimony otherwise, and we believe that if Dr. Bannerman had found any objective symptoms for plaintiff’s complaints or had otherwise found plaintiff suffering from disability, such testimony would have been produced.
Dr. Rose’s testimony is vague and general in its nature without any finding of objective symptoms to substantiate the plaintiff’s complaints, however, he generally stated that he believed that the plaintiff was in pain. Dr. Rose stated that the plaintiff came to the Sharoy Clinic in Amite on the day of the accident and was, he believed, kept over night as a matter of precaution. He testified:
“Q. Dr. Rose, just give us your original diagnosis and treatment and prognosis of Robert Young Thompson? A. The original diagnosis in this case was a back sprain or back strain, which ever term you wish to use. The prognosis of course was what we call guarded, that is uncertain as to the eventual outcome. Nothing serious should have resulted from such a diagnosis and condition. Treatment has included a great variety of orthopedic appliances such as back braces, more or less specialized exercises to the back and medications to relieve back pain. The condition has recurred at intervals and does give I think disabling discomfort at times to the patient. And I have no way of predicting the eventual outcome but as far as I can see we should expect eventually a recovery from such a condition.
“Q. Dr. Rose, of course his back was his chief and major injury and complaint. Do you recall as to there being a sprain of the left arm and hand? A. Yes, there was an injury to the left arm and hand as I recall now and I believe that was also examined by x-ray at the time and was, free of bony damages but it was a definite bruise and contusion of the wrist, I believe.
“Q. About the head, — A. And I believe he did suffer from headaches following the accident, I am sorry I didn’t have a chance to review this case but he did suffer from headaches following the accident for some time and was treated for those headaches and they disappeared in.the course of a few weeks and that is what I refer to as a cerebral contusion or mild jarring of the brain.
“Q. Was that as a result of an injury which was in the nature of a whiplash injury? A. Well, its not necessarily a whiplash injury. I believe that refers principally to the spine and neck, most frequently. It refers more specifically to a jar of the head itself and not necessarily involving the spine.
“Q. Dr. Rose, at this time can you give any definite duration of the persistence of these injuries? A. No, sir, I cannot. I couldn’t last week and I don’t believe I will be able to next year either. I haven’t been able to predict this sort of thing. Not in my work I haven’t.
“Q. These are actual pains and there is actually objective symptoms of these injuries and pains from your examination, is that correct. A. I don’t think you could call that objective but I believe these are subjective pains. I don’t see the pains, I don’t see his pain, I don’t see the patient’s pain but I believe he has pain. I can say that much in my opinion.
“Q. What type of medication and treatment have you prescribed for him? A. Well, in most of these cases and in this one too I believe, I run the gauntlet from plain aspirin and analgesics like aspirin to Flexin a new muscle relaxant, some cortisone I believe we used in this case orally, and to tell the *757 truth about anything we can lay our hands on to relieve back discomfort and that’s what you have to do whenever you have such a vague sort of a problem to work on.”
At the time of the accident this young man was attending school, and there is really no evidence to substantiate his claim that he lost any time on account of the disability to his back. Approximately two and a half months after the accident he went to work and lost no time other than necessary in a change from one job to another. Loss of time from work was not due to any injuries he suffered in the accident, and as a matter of fact on the date of the trial he was employed by the State of Louisiana in Baton Rouge and he commuted daily, which is approximately 120 miles a day, that he would ride in an automobile. It is true that approximately five workers commuted together and each would use his car a day a week which relieved plaintiff of the necessity of driving other than the one trip a week. There is testimony that his wife had rubbed him quite a bit, and that he had had many heat treatments at the Sharoy Clinic and at home, and that he wore a brace and he exhibited this brace to the jury, but under cross examination he admitted that he was not wearing the brace when he went to see Dr. Bannerman a very short time before the trial.
Dr. Rose summed up plaintiff’s treatment as follows:
“At the time of the original injury I believe he was kept overnight in the hospital. I am quoting from memory strictly because I have not reviewed this case and then he was seen daily I believe for three or four days and every third day, under observation for the cerebral contusion and then perhaps every two weeks for a course of about three months and during that time he did come to the office without seeing me and received diathermy or ultrasonic treatment, and then since about the first three months it has been every month or something like that.”
Considering the actions of plaintiff at the scene, the testimony of Dr. Rose, and the failure to produce the testimony of Dr. Bannerman we believe that an award of $2,000 would be ample in this case.
Plaintiff prayed for a judgment in the sum of $1,000 for damages to his automobile and as he has proven that it was $1,013, he is entitled to the amount prayed for in his petition, viz., $1,000.
Plaintiff offered evidence of his medical expenses in the amount of $157.80 which are apparently not disputed by defendant.
Defendant alternatively requests this court to remand this case for a new trial because “of the trial judge’s error in permitting evidence of prior accidents in which the defendant was involved * * * ”, Without passing upon whether or not the trial judge was in error in the respect complained of by defendant, we have carefully reviewed the testimony and without any consideration of the fact that the defendant had been in four admitted wrecks, two of which he stated voluntarily were his fault, and two which were not, we find that the verdict of the jury and the refusal of the trial judge to grant a new trial was not manifestly erroneous.
It is therefore ordered that the judgment be amended by reducing the award to the sum of $2,000 for personal damages, $1,000 for property damage to the automobile and $157.80 for medical expenses, or a total of $3,157.80, and as thus amended the judgment be affirmed.
It is further ordered that the costs of this appeal be paid by the plaintiff and all other costs paid by the defendant.