114 So.2d 648 (1959)
Ivy VEAL, Plaintiff-Appellant,
v.
AUDUBON INSURANCE COMPANY OF BATON ROUGE, Louisiana, Defendant-Appellee.
No. 4851.
Court of Appeal of Louisiana, First Circuit.
August 31, 1959.
Rehearing Denied October 1, 1959.
*649 Jos. A. Gladney, Baton Rouge, for appellant.
Sanders, Miller, Downing, Rubin & Kean, Baton Rouge, for appellee.
Before ELLIS, LOTTINGER and TATE, JJ.
ELLIS, Judge.
On August 2, 1956 at about 1 P.M. Ivy Veal was driving his automobile in a northerly direction on North Seventh Street in the City of Baton Rouge, accompanied by Carrie Mae Hafford who was riding on the front seat with him, and Shirley Mae Brady who was occupying the rear seat and was involved in an intersectional collision with a car owned and being operated in a westerly direction on Laurel Street by John B. Gremillion, whose insurer has been cast as defendant in a direct action. As a result of the collision at the intersection of North Seventh and Laurel Streets in the City of Baton Rouge between the Veal and Gremillion automobiles, Ivy Veal filed suit for personal injuries and property damage, and Leon Brady for alleged personal injuries. The cases were consolidated for the purpose of trial, which upon the prayer of plaintiffs was tried before a jury. The jury returned a verdict for Ivy Veal for $450, "with Interest", and in favor of Leon Brady for the use and benefit of his minor child, Shirley Mae Brady, and against the defendant for $50, "with interest". Both plaintiffs appealed devolutively to this court. The defendant in each case has answered the appeal praying for a dismissal of plaintiff's suit.
It is plaintiff's contention that he was not guilty of any negligence whatsoever and, alternatively, that should he be found guilty of contributory negligence that Gremillion had the last clear chance to avert the collision.
The defendant contends that Gremillion enjoyed the superior right of way under and by virtue of the traffic regulation code which is Title 2, Chapter 1 of The Code of Baton Rouge adopted Feb. 22, 1956 and in particular Sections 64 and 65, and therefore, under the proven facts of the case at bar plaintiff, Ivy Veal, was guilty of negligence which was the only proximate cause of the collision, contrary to the law of this state established by the Supreme Court of Louisiana in the case of Steele for Use and Benefit of Steele v. State Farm Mutual Insurance Co., 235 La. 564, 105 So.2d 222 and followed by this Court in the recent case of Johnson v. Southern Bell Telephone & Telegraph Company, La. App., 106 So.2d 22, 25, as these cases declare the law to be that:
"* * * The driver with the superior right of way is entitled to proceed *650 into the intersection and will be held free of negligence in an ensuing collision, since he is not called upon to anticipate that the other vehicle will fail to respect his own right of way, nor is he put on notice in the absence of the other vehicle's excessive speed or other circumstances reasonably perceived in time to avoid the accident that the other vehicle will enter the intersection in violation of the favored driver's right to enter same."
Defendant also contends that the facts in the case at bar subject it to the holding of the court in Ryan v. Allstate Insurance Company of Chicago, 232 La. 831, 95 So. 2d 328, 330, which held as follows:
"`* * * However, it would make absolutely no difference whether Leslie Evans did or did not stop his truck for he was guilty of negligence in either respect. If he brought his vehicle to a stop, there was the most wanton negligence on his part in proceeding from a position of safety into North Carrollton Avenue without ever seeing the approaching Bowers automobile; and if he made no stop, his negligence is too obvious to discuss.'"
Also in Koob v. Cooperative Cab Co., 213 La. 903, 35 So.2d 849, 851, as follows:
"The law in this state is well settled that a motorist is proceeding on a right-of-way street, upon approaching an intersection where traffic is required under a city ordinance, and is warned by stop signs, to come to a complete stop before entering the intersection, should not be held to the same degree of care and vigilance as if no ordinance existed or stop signs were erected. The danger at such an intersection is less than that at a corner where no stop signs have been erected, and therefore less care is required of the driver on a favored street. The motorist on the right-of-way street, with knowledge of the location of such a stop sign, has a right to assume that any driver approaching the intersection from the less favored street will observe the law and bring his car to a complete stop before entering the intersection, and such motorist can indulge in this assumption until he sees, or should see, that the other car has not observed, or is not going to observe, the law."
And in Broadway v. Purdue, La.App., 108 So.2d 805, 807 in which the Second Circuit Court of Appeal applied the recognized rule in rejecting plaintiff's demands as follows:
"It is a well-recognized and familiar rule in our jurisprudence that it is the duty of motorists before entering a superior thoroughfare to appraise traffic conditions and make certain the way is clear for safe passage, and failure to do this constitutes negligence which is a proximate cause of the resulting accident."
Also in Eschmann v. New Amsterdam Casualty Company, La.App., 110 So.2d 135, 136 in which the plaintiff stopped in obedience to the traffic sign and then proceeded into the intersection, the court held as follows:
"It appears quite clear to us that Mrs. Cigali was guilty of negligence in failing to accord the right of way to Eschmann who was proceeding at a normal rate of speed on a through street. She testified the two cars to the right of Eschmann stopped to permit her to pass, but we do not believe she endeavored to ascertain how close Eschmann's car was to the intersection when she slowly drove into his lane. If she had stopped in front of the other two cars and made proper appraisal whether cars were approaching, she would not have made her illfated move into Eschmann's pathway.
"We fail to find where there was any contributory negligence on the *651 part of Eschmann, and as to him we believe the accident was unavoidable."
Also in Southwestern Wholesale Company Inc. v. Lumber Mutual Fire Insurance Company, La.App., 110 So.2d 152, 153, the defendant contends that the facts are substantially the same as those in the case at bar. In that case the plaintiff's truck was being driven on the right-of-way thoroughfare at a speed of approximately 30 miles an hour and was within the established speed limit, while the other automobile was approaching the intersection on a subordinated street and actually came to a stop before entering the intersection. Plaintiff's truck left skidmarks of approximately 15 to 20 feet north of the point of impact, and in reversing the decision of the District Court, the Court of Appeal, Second Circuit held:
"We do not find that the record discloses any negligence on the part of the driver of plaintiff's truck. To the contrary, the failure of Carl Deaton to observe the approach of plaintiff's truck, there being no obstruction or hindrance to the view, constitutes an inescapable imputation of negligence. This failure to see what could and should have been seen, and Deaton's action in attempting to negotiate passage of the intersection in the face of approaching right-of-way traffic, was the sole and proximate cause of the collision."
Under the law as set forth and quoted from the Traffic Regulation Code of the City Code of Baton Rouge, supra, and that established by the jurisprudence relative to the same subject matter as established in the cases cited above and many others, some of which were cited in the case of Travelers Insurance Co. v. Great American Indemnity Company, La.App., 113 So. 2d 815, and Kirby Randle v. Baton Rouge Bus Co., La.App., 114 So.2d 651, a decision in cases of this kind is dependent upon ferreting out the true or correct facts as near as humanly possible from the evidence included in the record and applying the correct principle of law as set forth in the Traffic Code and established by the cited jurisprudence.
Laurel Street is 30 feet in width and the speed limit is fixed at 30 miles per hour in this area and is designated as a superior or through street, while North Seventh Street is a subordinate one with a stop sign located 18 feet and 7 inches south of the southeast corner of its intersection with Laurel Street, and it is 24 feet wide. On the day of the accident Ivy Veal, traveling north on North Seventh Street stopped approximately 3 feet south of the stop sign, and at this point looked to his left, then to his right and could see 187 feet from his stopped position to his right along Laurel Street, seeing nothing he then proceeded the 21 feet approximately to the intersection and then on into the intersection, and was struck on the right front fender and wheel by the left front portion of the Gremillion car when he had reached a point 3 feet south of the north parallel line of Laurel Street, 27 feet north of the south parallel line of Laurel Street, and 12 feet west of the east parallel line of North Seventh Street. Veal only looked to his right down Laurel Street after he had stopped several feet south of the stop sign located to the south of the southeast corner of the intersection of the two streets, and did not look before entering the intersection when he arrived at the south parallel line of North Seventh and Laurel Street. Veal never did see Gremillion's car until it struck him, which, of course, reveals that he never looked to the right after stopping to the south of the stop sign.
Richard C. Daniel, who testified in this case, at the same time was approaching Laurel Street on North Seventh Street, and had to stop behind the green Chevrolet of Veal, and after "The Chevrolet pulled off to cross Laurel Street, well, I moved up to sort of assume his position where to stop again, because I was a good ways, well, a fair ways back from the intersection behind this green Chevrolet, and as I pulled up I *652 looked to the left and began to clear both ways, and when I looked to the left I heard tires squealing on the pavement there and brought my attention around to direct ahead, and just at that split second, then this Buick ran into this Chevrolet, about the moment of impact that I saw." Daniel corroborates the point of impact as being 3 feet south of the north parallel line of Laurel Street as he stated when the collision occurred the front of Vel's car had gotten near the north side of the intersection. The witness testified that the Chevrolet of Ivy Veal went about 6 feet after the collision toward the northwest corner of the intersection and that the Gremillion car stopped at the point of impact. The measurements afterwards revealed that Veal's car had stopped at 9 feet while the Gremillion car stopped at the point of impact. An investigating officer stated that the Gremillion car had left 15 feet of skid marks before the collision which was consistent with a speed of 25 miles per hour. While the weather was cloudy the day was clear, at the time. The officer found the Veal car "against the northwest curb of North Seventh Street" facing in a northerly direction on North Seventh, with half the car on North Seventh and half on Laurel Street. This police officer was no longer with the force but it is evident from the testimony that he did not qualify too well as an expert on speed, as denoted by skid marks.
The testimony of Ivy Veal is corroborated by the two occupants of his car. It was the opinion of Veal as well as the two occupants of the car that Gremillion was traveling at a faster rate of speed than as he says "not under 25 nor more than 30."
Gremillion, the defendant insured, stated that "* * * I was driving at what I thought was a fair modest rate of speed, and all of a sudden this green Chevrolet was right in my path, it loomed right up in front of me, and immediately, as quick as I could react, I swerved towards the right and applied my brakes. I did both things simultaneously, and of course the two cars came into contact with one another somewhere in Laurel Street towards the lane, the opposite lane going into North Seventh, that is, the traffic is parked on one side of the opposite lane, but both cars, as far as I can recall, were still in Laurel Street. I know mine definitely was and it was at an angle to indicate that I had swerved to miss him," and stated that he had observed the green Chevrolet of Ivy Veal at a distance which he would "estimate at approximately forty feet from the junction of Laurel and North Seventh, and he was within the boundary of Laurel Street and he loomed right up in my path and that's when I swerved and applied my brakes. * * * I would say I was not traveling under twenty-five miles an hour and to the best of my ability I was not exceeding thirty."
The damage to Gremillion's Buick automobile was $264 and to that of Veal $199. Included in the item of damages to the Gremillion car was the fact that the motor had been knocked off the block on the left side at the point of impact.
Based upon the heretofore discussed facts, the plaintiff Veal, after looking from the left to right, went from his position several feet south of the stop sign to the intersection a distance of 21 feet 7 inches and then on into the actual intersection a distance of 27 feet to the point of impact, or a total distance of approximately 48 feet. He stated that he traveled from zero speed to 12 miles per hour approximately at the moment of impact, which would be an average speed of approximately 6½ miles per hour for the 48 feet, or roughly an average of 8 or 9 feet per second for the 48 feet.
One of the important questions to be answered in this suit is whether the failure of Ivy Veal when he arrived at the actual intersection to look to his right was a proximate cause of the accident, and the answer is to be determined by the location at that time on Laurel Street of the approaching Gremillion automobile. If the Gremillion automobile at the time Veal arrived at the intersection was too close to permit the latter *653 to make the crossing in safety, that is, with opportunity to clear same without, under reasonably anticipated conditions, obstructing the passage of approaching vehicles, or, as stated in the Traffic Code, approaching so closely as to constitute an immediate hazard, then Veal's failure to look would constitute such negligence as would be a proximate cause of the collision.
Counsel for plaintiff Veal argues that as he averaged approximately 6½ miles per hour for the 48 feet that he was traveling between 8 and 9 feet per second and it therefore took him 5½ to 6 seconds to traverse the 48 feet. Then he argues that if the defendant's insured, Gremillion, was traveling at 30 miles an hour, using the chart which was introduced in evidence and was the basis of the testimony given by an expert for the defendant, Major Edward O. Bauer, Jr., and which was prepared by the Traffic Institute at Northwestern University in May, 1957, he would have traveled 44 feet per second, and therefore, using 6 seconds as the interval that it took Veal to travel from a stopped position near the stop sign to the point of collision, and the fact that Gremillion was traveling 5 to 6 times the 44 feet, which would have the latter traveling 220 to 264 feet during the time that Veal traveled the 48 feet. This, of course, is based upon the rough estimate of speed given by plaintiff and defendant's insured, Gremillion, however, it is the estimate of speed which went before the jury and the judge and upon which the verdict is presumed to be based. The only fallacy in this argument is that counsel is using a uniform average speed of 6½ miles per hour for the entire 48 feet, whereas Veal started from zero and was of the opinion that he had reached a speed of 12 miles per hour at the time of the collision. It would be purely speculative and an assumption not justified by the evidence if we were to state that his increase in speed from zero to the estimated 12 miles per hour was uniform. However, we believe from the evidence that at the time Veal entered the intersection that the Gremillion car was not less than 90 feet and most probably more than 100 feet from the intersection and, therefore, Veal could not have been justified in believing that he could safely cross the intersection without seriously impeding the progress of the approaching Gremillion automobile. Veal was therefore guilty of contributory negligence which was a proximate cause of the accident, by his failure to observe approaching traffic before entering the intersection.
This brings us to the question of proper lookout as related to the doctrine of last clear chance, on the part of Gremillion. The defendant called as an expert witness Major Edward O. Bauer, Jr., who has been employed by the City of Baton Rouge in the Police Department in the capacity as traffic supervisor for approximately 17 years. His testimony is based upon "Charts and Tables for Stopping Distances" put out in May 1957 by the Traffic Institute of Northwestern University and which was introduced in evidence and used by Major Bauer during his examination on the stand. This Exhibit shows, and Major Bauer so testified, that the reaction time of a driver traveling at 25 miles per hour is 22 feet from the moment he discovers the peril, and at the same speed the actual braking distance after reaction time to be 28 feet, or a total of 50 feet, for a total braking distance at 25 miles an hour from the moment of the discovery of the peril. At 30 miles an hour the chart shows, and he so testified, that the reaction distance is 26 feet and the braking distance 40 feet, or a total of 66 feet. While this chart is quite different from the distances, etc., given in the one contained in Blashfield's and the Lawyer's Motor Vehicle Speed Chart, it is to be remembered that the expert witness for the defendant, Major Bauer, testified from this chart and gave the figures as contained in this chart, therefore, the jury and the judge had only such evidence on the question for the basis of its verdict and the court's judgment.
The law as applicable in the cases previously cited on behalf of the defendant *654 is most assuredly applicable to the case at bar, however, the facts distinguish the former from the latter. The cases cited also recognize the well-settled rule of law that while one may assume that his right of way on a favored street will be honored by traffic approaching an intersection on a subordinate street, it does not relieve the driver on the favored street of owing the legal duty to keep a proper lookout which is legally established as that of an ordinarily prudent motorist. The driver on the favored street does not have to keep a superlative lookout but should be ordinarily observant.
Gremillion himself testified that he never saw the plaintiff Veal until he loomed up squarely in front of him, which means that he did not discover the peril when he should have, and was not keeping a proper lookout. The facts show that Gremillion was within 30 or 40 feet of the Veal automobile before he ever saw it in the intersection, although at this time the front end had practically completed the intersection.
In order to determine whether the failure to keep a proper lookout was a proximate cause of the collision, we must determine the approximate location of the Veal car when Gremillion could and should have seen and realized that Veal was going to proceed into the intersection.
Had Gremillion seen Veal stopping or coming to a stop several feet from the stop sign he could have continued on the assumption that Veal intended to honor his superior right of way. But under the testimony which the Jury and Judge heard Gremillion was more than the visual distance of 187 feet from the intersection when Veal stopped 21 feet south of the intersection at the stop sign and therefore had he looked when he arrived within the visual distance he would have seen Veal moving toward the intersection, somewhere within 21 feet, and north of the stop sign. Veal's speed was increasing rather than decreasing and Gremillion could and should have seen that Veal was not stopping for the intersection when he was more than 100 feet from the intersection. Gremillion's failure to see Veal until the former was within approximately 40 feet of the point of impact constituted negligence and convicts him of a failure to keep a proper lookout. He could and should have seen Veal before the latter reached the intersection and realized that he was obviously not going to honor his superior right, and in any event he should have seen Veal when he actually entered the intersection. Had he observed Veal when he actually entered the intersection at a speed of 25 miles an hour, under the testimony which the jury and Judge heard, he would have had from 90 to more than 100 feet in which to avoid the accident, and according to the testimony at this speed he only needed 50 feet. If he was going 30 miles an hour he needed 66 feet. At either speed had he been keeping a proper lookout he could have and should have seen Veal when he actually entered the intersection, at which time there was more than sufficient distance between the two vehicles for him to have avoided the accident by either slowing or stopping his car. He had the last clear chance to avoid the collision.
We next come to the question of damages, personal injuries and property damage suffered by Ivy Veal for which he was awarded below the sum of $450. Of this amount he has proven $199.97 as damage to his car, the bill of Dr. Robt. Helm for $16, X-rays by Dr. Malen, $35; Dr. Campanella's bill for treatment, $35; medicines in the amount of $13.31; cost of transportation to Dr. Campanella's and Dr. Helm's office, $18, which would total $317.28. There is a claim for $280 for having to hire help to pick seven bales of cotton at a cost of $40 per bale in the fall of 1956, however, this item has not been proven with the necessary certainty. Having proven $317.28 worth of damages as above itemized, this would only leave $132.72 of the difference between the total amount awarded *655 of $450 for personal injury, pain and suffering.
Ivy Veal is asking for $3,000 as a result of acute strain of the right paravertebral muscle mass; $3,000 for sprain of the lumbo-sacral joint, and $4,000 for other bodily injuries, pain and suffering or a total of $10,000. The record reveals that immediately after the accident he felt no ill effects but that night he went to his daughter's home in Baton Rouge and his back and hip began to pain him, and it is his testimony that he has continually been disabled and at times in pain from the accident in his back and hip. A number of his relatives also testified that he complained of pain and was unable to pick his cotton because of his condition, that he had always done this in prior years. Although the accident occurred on August 2, 1956, his first visit was to Dr. Robt. N. Helm, a qualified general practitioner in New Roads, La., on October 12, 1956. At this time after an examination this doctor found some muscle spasm of the "muscle mass over the sacro-iliac joint," and he concluded that Ivy Veal had a sprain of the sacro-iliac joint and a sprain of the paravertebral muscle group, which is the muscles in that region over the joint. This doctor had treated Ivy Veal for an automobile accident which he had been in during the month of January 1956 and had been treated by Dr. Helm in March of 1956, complaining of pain in his right back, however, Dr. Helm explained that Veal's pain in October 1956 was more severe than it had been in March when he examined him. Dr. Helm also explained and testified that primarily the pain was in the upper part of the back, in a different region as a result of the automobile accident in January of 1956. Another difference which the doctor found between the March 1956 examination as a result of the accident in January 1956, and his examination on October 12, 1956 as a result of the accident in question was that no muscle spasm was found on the examination in March 1956. On October 12, after examination and diagnosis, he gave a prescribed medicine for the plaintiff which the latter obtained at a pharmacy in New Roads.
On October 14, 1956, the plaintiff returned to Dr. Helm and told him that he was not any better and this time the doctor gave him a medication which would help the arthritis which he found existent in plaintiff's back which was prescribed in the event plaintiff's condition was a combination of sprain and arthritis, and Dr. Helm saw plaintiff a week later and he still complained of being no better so he transferred him to Dr. Campanella and X-rays of plaintiff's back were taken. After Dr. Campanella saw the plaintiff Dr. Helm again saw him on January 6, 1957 and at this time he thought he had improved somewhat but he still had a very slight residual of the spasm of the paravertebral muscle group and a sacro-iliac sprain for which he recommended heat treatment primarily, and bed rest, salicylates and aspirin. He thought, however, that Veal had improved at this time. Dr. Helm again examined plaintiff just prior to the trial of the case and found him to be complaining of some pain on flexion when he bent to the right side and also some pain when he stood up and bent backwards on the right side, although, he found no muscle spasm. He stated that it was not unusual for a man of plaintiff's age (66) to have a slow recovery, and finally that the condition of the plaintiff in October 1956 could have been caused from trauma in the automobile accident on August 2, 1956. The X-ray which was taken at Dr. Campanella's instance showed a minimal arthritis that "you would expect in a person 65 years old in the region of the lumbar vertebrae." There were no evidence of fracture or dislocation shown in the X-rays in the area of pain complained of by the plaintiff.
On cross-examination this doctor re-affirmed his diagnosis in a report made on May 21, 1958 of the plaintiff's condition as follows: "Osteo-arthritis lumbo spine *656 and old sacro-iliac sprain, probably healed." He thought that the original sprain had probably healed but that the everyday activities such as driving a car or bending over or lifting any heavy object kept it re-sprained.
Dr. Campanella, an orthopedic surgeon, examined the plaintiff on October 5, 1956 at the request of Dr. Helm. At this time plaintiff complained to him of pain in the hip and back and that it hurt him at all times and was getting worse. Dr. Campanella's diagnosis was one of acute strain of the right paravertebral muscle mass and a mild sprain of the lumbo-sacral joint. He believed that the patient apparently sustained an injury to the lumbo-sacral joint and it pulled the muscles on the right side of the back, at which time he had not fully recovered but "felt that with heat and continuation of medicine he will recover." Dr. Campanella on the date of this examination found some spasm over the right paravertebral muscle mass. Dr. Campanella was not informed of any previous automobile accident and injury to any part of the plaintiff's back. In summation on direct examination he was asked the following question: "Q. In view of your findings on October 1956 and in view of your tests and examinations just made of Ivy Veal, what is your opinion as to how long this acute strain of the right para-vertebral muscle mass will continue with this man? A. It may be a permanent affair with him, particularly with this minimal arthritis." Objection was made to the above matter which was sustained by the court on the ground that the plaintiff had not alleged or sought damages for permanent disability. To the ruling of the court counsel for plaintiff excepted, and this will be discussed hereinafter.
Dr. Campanella made an on the spot examination of plaintiff in the presence of the jury on the date of the trial, May 22, 1958 and testified in detail as he examined the plaintiff, and stated that the latter "still has the muscle spasm which was limited to the right side and at this time he has a little on the left side. * * * He has spasm of the paravertebral muscle mass, and bi-laterally, the right one was a little worse than the left one." He would not say or stated that he was not in a position to tell the court what percentage of disability the plaintiff had in his back on the date of the trial.
Dr. Francis C. McMains, an orthopedic surgeon, examined the plaintiff on May 20, 1958 and found no muscle spasm or other objective symptoms and therefore could not explain plaintiff's complaint of pain except that "of a wear and tear type of arthritis, which he showed some on the X-rays but certainly was not very marked for a patient of his age, and I felt that for a man of his age that he had very little if any objective finding referrable to his back." He attributed the complaint of pain and disability to bend over or do or engage in other activities as being due to his arthritic condition which he found in the plaintiff's back. This doctor was a witness on behalf of the defendant.
Counsel for plaintiff has taken strenuous objection to the ruling of the lower court denying him the right to prove or attempt to prove the permanency of plaintiff's disability in his back because of the lack of a specific allegation alleging that plaintiff's disability was of a permanent nature. He contends that the verdict of the jury was inadequate because they could have refused to let them consider the testimony of the expert orthopedist, Dr. Thomas Campanella, to the effect that plaintiff's condition "may be a permanent affair with him, * * *". He contends in argument and in his brief that as his petition had set forth under "3. Other Bodily injuries * * *" and that the defendant in answering this allegation denied that petitioner sustained any injuries at all in said accident and "alternatively respondent alleges that if the petitioner was injured at all in said accident, the injuries were very minor and not of a permanent nature * * *". He further cites the case of Stoker v. Hodge Fence & Lumber Co., Ltd., 116 La. 926, 41 So. *657 211, and also the case of Ardoin v. Robinson, La.App., 176 So. 228, 232, in which a petition that alleged "in addition to the fracture of her spinal column, other injuries and contusions to her back" was held to be broad enough to entitle the plaintiff to prove "other injuries to her back besides the fracture * * *". Also cites and quotes from Vol. 15 Sec. 314 of American Jurisprudence which has a heading "Permanent Injuries" and states: "It is no doubt proper for plaintiff in a damage action to allege in his pleadings that the injury of which he complains is permanent. According to the weight of authority, however, damages for the permanency of an injury are recoverable under a general allegation for damages, without specially alleging the facts of permanency * * *". Counsel for the defendant has filed a supplemental brief in which he has answered the argument of counsel for plaintiff on the question of the introduction of evidence as to the permanency of plaintiff's disability. He calls our attention to the fact that counsel in the Ardoin case did not quote the second conclusion of the court in which it states, "evidence of other injuries was introduced without objection on the part of defendants, and, if the pleadings were not large enough to admit this proof, they have been made so by the introduction of this evidence without objection."
Counsel also quotes in answer to plaintiff's citation and quotation from the 15th American Jurisprudence, under the heading "Damages" at Section 314, an additional portion as follows:
"On the other hand, in many jurisdictions, damages for permanent injuries are regarded as special damages and may not be recovered under a general allegation of damages, without specially pleading the fact of permanency." Counsel also cites a Louisiana case decided by the Fifth Circuit Court of Appeal, viz, American Fire and Casualty Company v. Jackson, 187 F.2d 379, 382 in which it was held:
"We agree with appellant that the verdict was excessive, as a matter not of fact but of law, that is, that there was no basis in pleading or evidence for the submission of the issue of permanent injury, and, without such, no basis for a verdict of such size. Permanent injuries have not been alleged, and not only is evidence of permanent injury entirely lacking, the evidence offered is completely inconsistent therewith." Counsel has also cited cases from other jurisdictions to the effect that any claim for permanent injury must be especially pleaded and cannot be recovered under a general allegation of damages.
Counsel for plaintiff urges this court to consider Dr. Campanella's testimony that plaintiff's disability may be of a permanent nature or to remand the case to the district court for testimony as to permanency. Without discussing the pro or con of the question or the authorities cited for and against by able counsel, we believe that plaintiff's petition has requested a sufficient amount in specific language and figures to cover any disability which plaintiff may have suffered as a result of the automobile accident on August 2, 1956.
While we are inclined to take the view that the objection should have been overruled and that the amount prayed for upon which to base a final judgment is sufficient without a remand.
Counsel for plaintiff has asked for an increase in the amount awarded for physical injuries, pain and suffering to $4,500. We have read the cases cited by counsel for plaintiff on the question of quantum, in some of which the awards were for more than the $4,500 plaintiff is seeking and some for less. These cases are, viz., Carhee v. Scott, La.App., 104 So.2d 236, in which we find the injuries listed to be quite a bit more serious and painful than in the case at bar. The award in the cited case is for $2,500. Also cited by *658 plaintiff is Thompson v. Audubon Ins. Co., La.App., 101 So.2d 752 in which the plaintiff suffered a back injury, an injury to the left arm and hand and bruise and contusion of the wrist and was under continual treatment from the date of the injury to the date of the trial, which was a year or more, for the pain in his back. Plaintiff was awarded $2,000. Counsel also cites Marcantel v. Southern Farm Bureau Cas. Ins. Co., La.App., 102 So.2d 879 in which an award was made of $10,000 and in which the injury and resulting prognosis and pain was much more serious and severe than in the case at bar. Counsel next cites Price v. Fidelity & Casualty Co. of N. Y., La. App., 98 So.2d 708 in which plaintiff's injury reactivated a case of arthritis in his neck and back and he was placed in traction for two weeks continuously and each night for three and a half months thereafter, could not drive his car for nine months, not able to operate his lawn mower or do any of the household chores for about 14 months, during which time he suffered considerable pain and disability. The pain diminished somewhat thereafter and returned occasionally and it was necessary that he wear a steel brace and corset to support his back. In this case the plaintiff was awarded $5,000. Plaintiff in the case at bar had no such injury or serious results from his injury, nor has he had near the pain and suffering experienced by the plaintiff in the cited case. Also cited is the Supreme Court case of Snodgrass v. Centanni, 229 La. 915, 87 So.2d 127, in which the plaintiff suffered continuous pain from May 4, 1952, the date of the accident until the date of trial, March 1954, and was forced to wear a corset and at the time of the trial he was still suffering pain, whether he remained inactive or exerted himself physically by twisting or turning or lifting. In this case plaintiff was an accountant and in the afternoon it was difficult for him to sit still at his work due to the pain; the pain increased also from the activity of driving his car and disturbed his rest while trying to sleep, all of which was almost two years after the accident. The award in this case by the Supreme Court was $3,000. In the case at bar plaintiff's injuries, pain and suffering are not comparable to that of the plaintiff in the case cited.
Considering all the facts we believe that an award of $1,500 in this case would be proper and in line with recent jurisprudence with similar facts.
Counsel for the plaintiff asks that the fee of Dr. Campanella for testifying be fixed at $200 which would be an increase from that fixed by the lower court of $150. There is nothing in the record other than a bill attached to plaintiff's brief for $200 which was sent to counsel for plaintiff that would justify an increase in the award made by the lower court. The doctor from New Roads apparently testified as long or longer than Dr. Campanella and his fee was fixed at $50.
For the above and foregoing reasons it is ordered that the judgment of the lower court be amended by increasing the amount of the award to plaintiff for physical injuries, pain and suffering to the sum of $1,500, and as amended the judgment is affirmed.

On Applications for Rehearings.
PER CURIAM.
By application for rehearing we are informed by plaintiff-appellant that a dispute has arisen as to the total amount of the judgment. Although we do not believe that the matter needs clarification, the judgment as amended and affirmed by our court provided for awards of $317.28 for special damages and of $1,500 "for physical injuries, pain and suffering"; or for a total award of $1,817.28, together with legal interest thereon from date of demand until paid, together with all costs of these proceedings.
Counsel for defendant-appellant urges most strongly that the holding of this case *659 is contrary to Johnson v. Southern Bell Telephone & Telegraph Company, La.App., 106 So.2d 22, 25, wherein we stated:
"We have repeatedly held that under these circumstances the driver with the superior right of way is entitled to proceed into the intersection and will be held free of negligence in an ensuing collision, since he is not called upon to anticipate that the other vehicle will fail to respect his own right of way, nor is he put on notice in the absence of the other vehicle's excessive speed or other circumstance reasonably perceived in time to avoid the accident that the other vehicle will enter the intersection in violation of the favored driver's right to enter same." (Italics ours.)
The substance of our present decision is, succinctly, that we find no manifest error in the determination of the trier of fact that plaintiff Veal entered and proceeded slowly across the favored thoroughfare upon which the defendant's insured was approaching with the right of way, when the latter was a sufficient distance away that in the exercise of reasonable care he should reasonably have perceived this violation of his right of way and had the reasonable opportunity, under the evidence introduced in this case, to avoid the accident upon making this reasonable observation after Veal's entry into his path from the side street. This is admittedly a borderline situation, and we have held that in such instances (where a second or so, or a few feet may make the difference between negligence or not) we will not disturb the determinations of the trier of fact unless manifestly erroneous. Nix v. State Farm Mutual Ins. Co., La.App., 94 So.2d 457; Starnes v. Mury, La.App., 90 So.2d 901; LaFuria v. Tarver, La.App., 86 So.2d 232.
All other matters raised by the applications for rehearing have been disposed of by the original opinion of this court.
Both applications for rehearings are denied.