240 So.2d 111 (1970)
Vivian B. MURPHY, Wife of/and Pat Murphy
v.
Edward L. PIRO, Richard Lopez, Continental National American Group and New York Life and Marine Underwriters, Inc.
No. 4068.
Court of Appeal of Louisiana, Fourth Circuit.
October 5, 1970.
Rehearing Denied November 2, 1970.
*112 Stringer & Manning, George C. Stringer, Jr., New Orleans, for plaintiffs-appellees.
Deutsch, Kerrigan & Stiles, Francis G. Weller and Christovich & Kearney, W. K. Christovich, New Orleans, for defendants-appellants.
Hammett, Leake & Hammett, Donald Hammett, New Orleans, Richard A. Deas, Robert E. Leake, Jr., and Gordon F. Wilson, Jr., New Orleans, for defendant-appellee.
Before REGAN, LeSUEUR and SWIFT, JJ.
SWIFT, Judge.
This suit resulted from a vehicular collision which occurred on Metairie Road in Jefferson Parish at about 7:35 A.M. on June 14, 1966. Involved in the accident were a passenger vehicle operated by Mrs. Vivian Murphy and a truck driven by Edward Piro. The truck was owned by Richard Lopez, who was insured against public liability by two companies, New York Fire and Marine Underwriters, Inc., being the primary insurer to the extent of $10,000.00, and the excess insurer being Continental Casualty Company (erroneously designated in the petition as "Continental National American Group"). Mr. and Mrs. Murphy sued Piro, Lopez and these two insurance companies for damages. Later by supplemental petition, plaintiffs' own insurer, Hardware Dealers Mutual Fire Insurance Company, was joined as a defendant in the alternative, to make available the protection of the uninsured motorist provision of that policy in the event the court should find Piro did not have the truck owner's permission to use the vehicle and thus there was no coverage by Lopez's insurers.
Following a trial on the merits, the trial judge concluded that Lopez had consented to Piro's use of the truck and rendered judgment against New York Fire and Marine Underwriters in favor of Mrs. Murphy for $10,000.00, plus $1,632.20 for Mr. Murphy for medical and other expenses. He also rendered judgment in favor of Mrs. Murphy against Continental National American Group for an additional $30,000.00. The suit was dismissed with prejudice insofar as Lopez and Hardware Dealers Mutual Fire Insurance Company were concerned. However, it was dismissed as of non-suit as to defendant Piro, because he died prior to the trial and no legal representative was substituted in his place.
The defendants cast in judgment have appealed, contending the lower court erred: (1) in its conclusion that Piro had the consent of Lopez to drive the truck; (2) in assessing damages against New York Fire and Marine Underwriters, Inc., for $1,632.20 in excess of its policy limit; and (3) in awarding excessive damages to Mrs. Murphy.
Plaintiffs, as a protective move, have appealed from that part of the judgment dismissing their claims against Hardware Dealers Mutual Fire Insurance Company.
*113 It was stipulated at the trial that Mrs. Murphy was free of fault and that the accident was caused solely by the negligence of Piro.
The record shows that Richard Lopez was an independent contractor who installed carpet for various retail carpet stores in Baton Rouge and New Orleans. A large portion of his work was done for Carpet World, a Jefferson Parish carpet outlet, owned and operated by Ralph Duncan. Edward Piro, driver of the truck involved in the collision with Mrs. Murphy's vehicle, was a salesman for Carpet World.
The testimony of Edward Piro which was taken by deposition prior to the trial was properly admitted in evidence by reason of his death. LSA-C.C.P. Art. 1428 (3) (a). He testified that he met Richard Lopez and his brother as he was leaving work early the day before the accident, because he was not feeling well and asked them for a ride. One or the other, he did not remember which, suggested that he drive Lopez's truck home as they were through for the day. It was parked at the side of Carpet World's Building, and Arthur Lopez went with Piro and showed him that the keys were in the truck's ignition. Mr. Piro drove the truck to his residence, and on his return the following morning the accident occurred. He saw Richard Lopez at the store several days later, who told him only not to worry as Lopez was covered by insurance.
On the other hand, Richard Lopez positively denied having given Piro permission to use the truck on this or any other occasion. He testified that in June of 1966 he lived in Baton Rouge and travelled to and from New Orleans almost every day to work. Generally, he left his truck overnight at a gas station near Carpet World's store in the shopping center on Airline Highway, and travelled to and from Baton Rouge in his brother's car. According to Lopez, the only occasion on which the truck was left overnight in the Carpet World parking area was on the day before this accident occurred. Although it was not mentioned by Lopez when he was called by plaintiff to testify on cross-examination, on direct examination he said that he left the truck keys with Mr. Duncanin his desk with instructions to lock it up and park it beside his own trucks as there were materials belonging to Carpet World in the vehicle. He did not see Piro at the time, but had seen him earlier in the day doing a lot of talking and cursing and looked as though he was intoxicated. Duncan had asked him to leave the store. When Lopez, his brother Arthur, and son, David, got to the store early the next morning they found the truck missing. He talked to Mr. Duncan, who told him he did not know where it was or anything about the truck. Thinking the vehicle had been hauled to a car pound, he said he went to a place in New Orleans on Tulane, was referred to the police station on Broad, and was then sent to a place (apparently the Jefferson Parish Sheriff's office) in Metairie. However, he did not wait long enough to complete a stolen vehicle report. Lopez explained he was not familiar with such things, and simply went on back to the Carpet World and found that his truck had been wrecked. He had no idea before he got back there that Piro had the truck.
Arthur Lopez denied that his brother told Piro he could use the truck, but he was unable to recall just what took place the day before the accident. He remembered finding the truck missing on the morning of June 14, going with Mr. Duncan to look for it and finding it wrecked. He also testified the truck keys were sometimes left in the store.
David Lopez, who was 17 years old at the time of the trial, did not recall any details concerning the parking of the truck, its keys or its use by Piro.
Ralph Duncan testified that Carpet World employed three or four salesmen and used a number of mechanics or carpet layers such as Lopez. He did not recall *114 whether he was in the store the day before the accident occurred. However, he said that on the morning of June 14th, Richard Lopez and his brother came in. There was work for them to do, but the truck was missing. Someone indicated that Piro had it, but Duncan did not recall who brought this up. He thought both Lopez brothers went with him toward Piro's house to look for the truck, but he was not sure. On the way they found the wrecked vehicle. He said that the truck was left in the parking area of the shopping center in which his store was located, many nights before the accident. However, he positively denied that Lopez or any of the other mechanics ever left their keys with him or with anyone else in the store. He said he did not know whether Piro had permission to use the Lopez truck. However, during cross-examination by counsel for defendant, Hardware Dealers Mutual Fire Insurance Company, portions of Duncan's discovery deposition were read to him wherein he had said that Richard Lopez told him Piro had the truck when he first came in the store on the morning of the accident. He also had testified "* * * this one time he come in and told me that Mr. Piro has the truck, or loaned it to me, something like that; this is why I went to his house. * * *" When confronted with such previous testimony, Mr. Duncan admitted it was correct, and said he simply had forgotten these things because of the lapse of time.
Mr. Duncan's entire deposition was admitted in evidence over objection with a statement by the court that it would "disregard anything not pertinent to the actual questions asked." Inasmuch as the witness unqualifiedly admitted having testified in accordance with those parts of the deposition that were read to him and also acknowledged the correctness thereof, we believe the trial court erred in admitting the entire deposition. Once a witness has admitted making a prior inconsistent statement no useful purpose is served by admitting the recorded statement in evidence. However, it appears from his written reasons for judgment that the trial judge only considered and relied on that part of the deposition which was read into evidence on cross-examination. In referring to the deposition he said simply, "it is apparent from the conversation Mr. Lopez had with Mr. Duncan on the morning of the accident that he was aware of the fact that Mr. Piro had his (Lopez') truck." Thus, admitting the entire deposition in evidence had no effect on the outcome of this case in the lower court.
It readily can be seen that the trial judge was presented with a clear conflict in the testimony of Mr. Piro and Mr. Lopez as to whether permission was given by the latter to the former to use the truck involved in this accident. Having heard and considered all of the evidence he believed the testimony given by Mr. Piro on deposition that he was given such permission. In reaching this conclusion it was also necessary for him to resolve the conflicting statements of Mr. Lopez and Mr. Duncan in regard to possession of the truck keys and Lopez' knowledge on the morning of the accident that Piro had the truck, and he was unable to accept Lopez' assertions.
Thus, it readily can be seen that the principal issue presented in this case and on this appeal are factual, to be determined mainly by deciding who told the truth.
The conclusions of the trial judge with regard to facts, particularly those involving credibility of witnesses, are entitled to great weight and will not be disturbed on appeal unless shown to be manifestly in error. Scruggs v. McCraney, 234 So.2d 262 (La.App. 4 Cir. 1970); Readco Industries, Inc. v. Myrmax Specialties, Inc., 236 So.2d 573 (La.App. 1 Cir. 1970). We cannot say the trial judge's findings in this case are not supported by the record or are clearly erroneous, and therefore affirm his decision that Mr. Piro had permission to drive the truck involved in the collision with the Murphy vehicle.
*115 Appellants argue that the lower court also erred in not permitting them to explore fully the matter of Piro's previous intemperate habits. It is unnecessary for us to decide in this case whether or not such evidence is admissible to prove the condition of a person on a particular occasion. Despite the objection, there is testimony in this record that Piro missed many Mondays from work (this truck was driven home by him on a Monday) because of heavy drinking during the weekends. However, it is clear that this was not always the case. Consequently, in our opinion the admission of additional evidence on the subject would simply be cumulative and would not change the result.
Turning to the question of quantum, the record clearly establishes that Mrs. Murphy suffered severe and permanently disabling injuries. There was no dispute among the physicians who testified as to her condition.
Dr. J. Morgan Lyons, a general surgeon, testified when he examined plaintiff at Southern Baptist Hospital on the day of the accident she complained of severe pains in the chest, abdomen, knees, legs and arms. She had several fractured ribs and contusions of her chest and abdomen. A laceration of the right knee required suturing. There was also evidence of injury to her arm and hand. Mrs. Murphy was hospitalized for about a week. Her chest was strapped and she was treated with injections and drugs. Her fractured ribs were painful for several months. She also developed symptoms of menopausal syndrome, i. e. irritability and nervousness, for which she was given injections of female hormones. Dr. Lyons felt this condition was precipitated by the accident of June 14, 1966. He referred her to Dr. Rufus H. Alldredge, an orthopedic surgeon, in September, 1966, when it appeared that her right hand and knee were not healing as expected. Her last visits to Dr. Lyons were in October, 1966, and in March or May of 1967.
Dr. Rufus H. Alldredge treated Mrs. Murphy for complaints of pain in her right hand and right knee. He found she had the signs and symptoms of tendinitis of the flexor tendon of the right thumb and medial nerve compression syndrome in that wrist called "carpal tunnel syndrome." The latter is a condition in which the medial sensory nerve in the wrist swells causing a ligament located just above it to tighten and create a compression groove in the nerve. It is characterized by numbness of fingers, loss of hand strength, and pain in the hand often so severe as to interfere with the patient's sleep pattern. Cortisone injections provided only temporary relief. Therefore, plaintiff later underwent an operative procedure under a general anesthetic in which the ligament was cut free of the medial nerve, releasing the pressure thereon. This provided relief from the severe hand pains, but had no effect on the tendinitis of the flexor tendon of her thumb.
When Dr. Alldredge examined Mrs. Murphy on November 28, 1967, just before the trial, he noted signs and symptoms of tendinitis of the flexor tendons not only of her right thumb, but of the long and ring fingers as well. In addition, there was diminution of sensation of these members of the hand, which the physician believes will be permanent. He also found about 25 per cent limitation of motion in flexion and extension of the right wrist, as compared to the other, which probably will be permanent. This, he thinks, is caused by arthritis that developed in the wrist as a result of the injury.
Dr. Alldredge recommends an operation to alleviate the tendinitis of plaintiff's thumb and long and ring fingers. It will require hospitalization for less than a week, with immobilization of the hand for possibly three weeks.
Dr. Alldredge also treated the plaintiff's right knee, which he found to be swollen and tender to touch. He diagnosed this *116 condition as chondromalacia of the patella, which is an erosion or roughening of the cartilaginous undercover of the kneecap. The doctor recommends surgical exploration of the right knee and feels "pretty sure" the patella will have to be removed to remedy the painful condition. This operation cannot be done at the same time as the surgery on her hand. The total period of hospitalization for such knee surgery would be about two weeks. Plaintiff would be immobilized by a cast from the top of the thigh to her toes for a period of about one month. Following a removal of the cast, plaintiff would have to walk with the assistance of crutches and have physiotherapy for limbering up and strengthening the muscles. The total time for recovery would be some three or four months. Although such an operation would alleviate the painful condition, Dr. Alldredge felt there would be a permanent weakness of plaintiff's leg which would leave her with a 25 per cent disability of the lower right limb.
Dr. John A. Colcough, a specialist in neurological surgery, testified he examined plaintiff on February 13, 1967, for pain in her low back and lower extremities. At this time he found considerable right lumbar paravertebral muscle spasm and maximum tenderness upon applying pressure between the first lumbar and first sacral vertebrae to the right of the mid-line. X-rays revealed minimal narrowing of the disc space at the lumbosacral joint. His examination also revealed a gait impairment, weakness of some of the small muscles of the hand, of flexors of the right leg and foot and of the extensors of the right foot. A sensory examination revealed an impairment of perception of pain and temperature and touch over the right first toe, impairment as to touch of the right fifth toe, impairment as to pain and temperature of index finger of the right hand; all indicating permanent impairment of the nerves supplying these areas.
In the several times that this doctor saw plaintiff between February, 1967, and July, 1967, plaintiff complained of continuing pain of a more severe nature in the low back. This physician later found that the sciatic stretch tests elicited a more pronounced reaction, indicating increased compression of the first sacral nerve.
Dr. Colcough's diagnosis was pressure upon the first sacral nerve which was caused by herniation of the fifth lumbar intravertebral disc. He recommended that a laminectomy be performed as soon as Mrs. Murphy could reduce her body weight and submit to a myelographic examination. This operation would require a ten day hospital stay and a three month period of restricted activity following the operation. There should be a complete resumption of normal activities after six months.
Our Supreme Court has made it quite clear that trial courts have great discretion in awarding general damages for personal injuries, and such awards should not be disturbed on appellate review in the absence of clear abuse after taking into consideration that each personal injury is to be evaluated according to its own peculiar facts and circumstances. Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). In view of the multiple injuries and permanent disability sustained by Mrs. Murphy, as well as the operations which the doctors believe will be necessary in the future, we cannot say that there has been a clear abuse of the trial judge's discretion in this case.
The only remaining issue is that of the apportionment of damages between the two insurers of Mr. Lopez. The New York Fire and Marine Underwriters, Inc., was cast in judgment for $11,632.20, the $1,632.20 for special damages resulting from Mrs. Murphy's injuries being in excess of the policy limit of $10,000.00. This was erroneous under the policy provisions. However, since Continental Casualty Company, the excess insurer, was cast in judgment in an amount below its policy limits, no reduction of the aggregate award to Mrs. Murphy is required. It need only be reapportioned *117 between the two insurers cast in the judgment.
For the reasons assigned, the judgment appealed from is amended and recast insofar as the awards to plaintiffs are concerned to read as follows:
It is ordered, adjudged and decreed that there be judgment herein in favor of Mrs. Vivian B. Murphy, wife of Pat Murphy, and against the defendant, New York Fire and Marine Underwriters, Inc., in the full and true sum of Eight Thousand Three Hundred Sixty-Seven and 80/100 ($8,367.80) Dollars, together with legal interest thereon from date of judicial demand until paid. It is further ordered, adjudged and decreed that there be judgment herein in favor of Pat Murphy, plaintiff, and against defendant, New York Fire and Marine Underwriters, Inc., in the full and true sum of One Thousand Six Hundred Thirty-Two and 20/100 ($1,632.20) Dollars, together with legal interest from date of judicial demand until paid. It is further ordered, adjudged and decreed that there be judgment herein in favor of Mrs. Vivian B. Murphy, wife of Pat Murphy, and against defendant, Continental Casualty Company, in the full and sum of Thirty-One Thousand Six Hundred Thirty-Two and 20/100 ($31,632.20) Dollars, together with legal interest thereon from date of judicial demand until paid.
In all other respects the judgment of the lower court is affirmed. The costs of court, including the costs of this appeal, are assessed to defendants, New York Fire and Marine Underwriters, Inc. and Continental Casualty Company, in equal proportions.
Amended, recast and affirmed.