252 So.2d 137 (1971)
Kennith E. HOOPER and Ronald Lee Trahan, Plaintiffs-Appellees,
v.
M. H. WILKINSON, Travelers Insurance Company, et al., Defendants-Appellees and Appellants.
No. 3464.
Court of Appeal of Louisiana, Third Circuit.
August 20, 1971.
Rehearing Denied September 23, 1971.
*138 Jones, Kimball, Patin, Harper, Tete & Wetherill by James C. Hanchey, Lake Charles, for defendants-appellants.
Alvis Roche, Lake Charles, for plaintiffs-appellees.
*139 Holt & Woodley by Edmund E. Woodley, Lake Charles, for defendants-appellees.
Before FRUGÉ, HOOD and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
On July 18, 1967 Augenstein Construction Company was engaged in laying a pipeline between the locations of Pittsburgh Plate Glass Company and Stauffer Chemical Company, pursuant to a contract with Pittsburgh, in Calcasieu Parish, Louisiana. The pipeline was being laid between two existing lines in a right of way measuring between 40 and 60 feet in width. In connection with the operation, a dragline was being operated in the area by its owner, M. H. Wilkinson, under a verbal contract with Augenstein. Wilkinson had previously been working on the same site under contract to Loftin and Goss Construction Company who was a subcontractor of Augenstein. The ground was wet and boggy necessitating the use of wooden mats, measuring 4 × 24 feet and weighing one ton each, to support the dragline. Toward the end of the day, while Wilkinson was stacking these mats out of the way, one of them slipped and struck a riser connected to one of the existing pipelines. The riser was a two-inch pipe which protruded a short distance above the ground and was connected to the buried pipeline some three feet below the ground. As a result of the blow, a leak occurred at or near the junction of the riser and the buried pipeline, and natural gas, which was flowing through the line under pressure, began to escape.
Because it was suspected that the damaged line belonged to it, Continental Oil Company was contacted and asked to send out some men. Two men, James Cromwell and William Wilson went to the site and ascertained that a small quantity of natural gas was leaking from the pipe. These men, however, were safety engineers and were unfamiliar with the company's pipelines and so they returned to the refinery and placed a telephone call to the Gillis headquarters of Continental Pipeline. They, in turn, called Dan Robicheaux, their field foreman, by radio and he went to the site. Mr. Robicheaux ascertained that the line belonged to Continental and called his office to have them determine whether they had plats that would show whether the line had a cut-off valve below the leak. While he was awaiting a reply from the office he obtained the services of two employees of Augenstein, Kennith E. Hooper and Ronald Lee Trahan, to dig around the riser in an effort to determine whether a cut-off valve was present. A third Augenstein employee, one Ashworth, also began to dig but ceased doing so soon thereafter.
Hooper and Trahan continued to dig for approximately one hour and were climbing out of the hole they had dug, when suddenly the leak became enlarged allowing a large flow of gas to escape with a great deal of force. Alleging that they were injured by the sudden escape of gas, Hooper and Trahan initiated the instant litigation in tort.
By an original and several supplementing petitions plaintiffs named as defendants Wilkinson and his insurer, Travelers Insurance Company, Continental Oil Company and its insurer, Hartford Accident and Indemnity Company, Loftin and Goss and its insurer, Continental Insurance Company, and five individuals including Dan Robicheaux and Bill Wilson, the only two of the five that were cited and served and thus made parties to the action.
Continental Oil Company and Loftin and Goss, together with their insurers, filed motions for summary judgment which were granted by the trial court. The judgments of dismissal were appealed to this court and we affirmed as to Loftin and Goss but reversed and remanded as to Continental. The latter had based its motion on the premise that plaintiffs were its borrowed employees at the time of the blowout and thus limited to workmen's compensation claims against it, but it was our opinion that a material issue of fact existed in the contention. Hooper v. Wilkinson, La.App., 225 So.2d 66.
*140 Trial on the merits was finally had before a jury which found Wilson and Wilkinson to be free from negligence proximately causing the accident, and which held Continental, Hartford, and Robicheaux liable to plaintiff Hooper for $5,000.00 and to plaintiff Trahan for $300.00. The three defendants cast appealed that judgment to this court alleging numerous specifications of error in the jury's conclusions.
The first of these involves the finding of the jury that plaintiffs were not borrowed employees of Continental. As we stated in Hooper v. Wilkinson, supra, when this case was previously before us, two tests are used in determining whether an individual is a borrowed employee: 1) Whose business was the employee engaged in, and 2) who had authoritative control of the employee. Therein we stated that Augenstein had a substantial interest in minimizing the damage to Continental's pipeline, as Wilkinson was in the employ of Augenstein when he struck the riser. Although we noted that Robicheaux gave plaintiffs instructions as to where to dig, what to look for, not to make sparks, etc., we also said that, "There can be little question but that Augenstein had the right to control plaintiffs or to remove plaintiffs from the job had they so desired". We quoted from the landmark case of Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137, wherein the Supreme Court said:
"Since Guillory was in the general employ of Hunt Tool Company, it must appear from the evidence in order for it to be relieved from liability that the relation of master and servant which existed between them had been suspended, and that a new like relation between Guillory and Morris & Meredith had been created and was in existence at the time of the accident.
"Under the circumstances of this case we concluded that it was the work of Hunt Tool Company which was being performed, and that that company had not relinquished the right to control Guillory in the performance of it. * *
* * * * * *
"We therefore conclude that Guillory was not the borrowed servant of Morris & Meredith but was the servant or employee of Hunt Tool Company at the time the accident occurred." (Emphasis ours.)
See also Fontenot v. National Transfer Company, 99 So.2d 795 (La.App.1st Cir. 1957.)
Of course when this case was before us the first time, we did not have the benefit of the oral testimony adduced at trial. We now have it before us, and we find that the testimony given by plaintiffs in their depositions is significantly different from that which they gave at trial. Thus the general tenure of their depositions is that Robicheaux, the Continental employee, guided and controlled their digging operations, whereas at trial they denied this, admitting to having received only minimal instructions from Robicheaux. The only other persons having direct personal knowledge of who controlled the digging operations were Hob Nail, Augenstein's supervisor and Robicheaux. Nail's version of the incident is unavailable, he having died soon after the accident. Robicheaux testified that he borrowed the plaintiff's from Nail because his own repair crew was unavailable at the time, and that he had complete charge and responsibility for the digging activities.
The jury had the benefit of the depositions as well as their personal observation of the witnesses and they chose to rely on the trial testimony of the plaintiffs. To do so was not manifestly erroneous. Fontenot v. Fidelity General Insurance Co., La.App., 185 So.2d 896, writ refused, 249 La. 578, 187 So.2d 740; McDonald v. Book, La.App., 215 So.2d 394. Therefore, although we are impressed with the appellants' argument in this regard and have serious doubts of plaintiffs', especially Hooper's veracity, we are constrained by one of the most stringent rules of appellate review to affirm the jury's finding that plaintiffs were not the borrowed employees *141 of Continental. The rule being that findings of fact made by a jury, particularly when they involve the issue of credibility of the witnesses, may not be disturbed on appeal unless they are characterized by manifest error. Murphy v. Piro, La.App., 240 So.2d 111; Schram v. Castille, La.App., 223 So.2d 229; Scruggs v. McCraney, La. App., 234 So.2d 262.
Second, appellants contend that the jury erred in not finding plaintiffs to have been contributorily negligent. The evidence shows that plaintiffs' foreman, Johnny Bridges, ordered them to go to the site of the leak and that Hob Nails, their supervisor, was present at the site. In this connection we are not unmindful of the fact that plaintiffs were but common laborers engaged in an activity which their superiors ordered them to engage in, at the site of their employment. Although the normal hours of their working day had passed, the evidence is that it was not unusual for them to work overtime.
There is considerable conflict here also, between the depositions of plaintiffs and their testimony at trial. In the former, they expressed knowledge of the fact that they were dealing with a live pipeline and considerable fear for their safety while in its proximity. At the trial, on the other hand, they testified to their lack of awareness of the danger involved and indicated that they would not have gone near the leak had they realized its dangerous nature. Here again the jury apparently chose to believe the later version and for the same reasons we must accept their findings as correct.
The third specification of error states that any claims that plaintiffs might have had against Robicheaux are barred by prescription. Appellants correctly state that Robicheaux was not made a defendant until May 14, 1969 when he was brought in by a supplemental petition. However, Robicheaux was sued in solido with, inter alia, Continental, and Continental was found to be liable to plaintiffs. Under the allegations of negligence contained in the pleadings Robicheaux and Continental would be joint tortfeasors and the liability of both having been established, they are solidary obligors. La.Civil Code, Arts. 2315, 2316, 2324; Franks v. City of Alexandria, La.App., 128 So.2d 310; and cases cited therein. Appellants argue that unless there is independent negligence on the part of an employer, it cannot be considered a solidary obligor with its employee, citing Williams v. Marionneaux, 240 La. 713, 124 So.2d 919; and Little v. State Farm Mutual Automobile Ins. Co., La.App., 177 So.2d 784. While we do not quarrel with this argument, we think there is sufficient evidence in the record before us to establish the negligence of Continental independently from that of Robicheaux.
Our law is clear that the filing of suit against a solidary obligor interrupts prescription as to another solidary obligor sued in a later supplemental petition. La. C.C. Arts. 2097, 3552; Ensminger v. Great Atlantic & Pacific Tea Co., La.App., 134 So.2d 686; Franks v. City of Alexandria, supra. Accordingly prescription had not run in favor of Robicheaux and he was timely brought into the suit. Appellants do not question the finding of negligence on his part.
As error number four, appellants argue that the bills of Ochsner Clinic for the evaluation and deposition of Dr. John Jackson should not have been admitted as items of medical expense. We agree.
It is evident from the deposition of this physician that he did not treat plaintiff Hooper in any way. He in fact, stated that he administered no treatment but merely "evaluated" Hooper at the request of his attorney. We are convinced that this evaluation was made in preparation for trial and was not a legitimate item of medical expense. Warren v. Yellow Cab Company of Shreveport, Inc., La.App., 136 So.2d 319; and cases cited therein.
Likewise, Dr. Jackson's deposition was not a legitimate item of medical expense. His expert witness fee was set by *142 the trial judge at $50.00, the same fee granted to the other physician who testified. The expert witness fees of physicians are to be fixed by the trial judgenot by the physicians. Veal v. Audubon Insurance Company of Baton Rouge, La.App., 114 So. 2d 648. An additional fee will not be allowed under the guise of medical expense.
In the alternative appellants specify as error the jury's action in awarding Trahan the sum of $300.00 and Hooper the sum of $5,000.00, claiming that these amounts are excessive.
Trahan was flung to the ground by the force of the escaping gas and was caused to tumble thereon. He testified that as a result, he suffered serious bruises and a sore neck, with headaches and dizziness that lasted some two months following the accident. He was absent from work only on the day following the accident but stated that he worked in pain because he had to, and because he thought the headaches would cease without medical attention. Approximately one month after the accident he consulted Dr. Russell Moore, Jr., a general practitioner from Sulphur, Louisiana, to whom he related much the same symptoms.
Dr. Moore stated that he saw Trahan in his office on three occasions and found him to be suffering from hypertension and a moderate anxiety reaction. Although he did not opine that Trahan's symptoms were due to trauma, he did not definitely commit himself one way or the other.
In view of the uncontradicted testimony of Trahan, and the wide latitude allowed juries in their assessment of damages, we cannot say that there is such error here as would justify our reducing the award. La. Civil Code Art. 1934(3); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127.
Plaintiff Hooper was thrown some 40 feet into the air by the force of the escaping gas, suffering injuries to his back, neck and shoulder. Also multiple metallic paint flakes became imbedded in the skin of his scalp, face, and chest. He was immediately taken to the West Calcasieu-Cameron Hospital in Sulphur, Louisiana where he was treated in the emergency room by Dr. Russell Moore, Jr.
Dr. Moore testified that he first saw Hooper in the above-said hospital at about 5:00 P.M. on July 18, 1967. Hooper complained to him of pain in the face and chest, the latter especially on breathing. The paint particles were removed and some of these were found to be sufficiently deep in the skin as to indicate the desirability of a tetanus toxoid injection. That, and an injection of Demeral and Vistaril for the alleviation of his pain, were administered to the patient. Dr. Moore stated that even though Hooper complained of dizziness, it was not really dizziness that he had, but rather simple light headedness. He said that Hooper was conscious the entire time he was with him, that he was well oriented, and that there was no evidence of a concussion, as his pulse, blood pressure, skin, etc. were all normal. That evening Hooper was transferred, at his request, to St. Patrick's Hospital in Lake Charles where he was to be treated by Dr. Harry S. Snatic.
Dr. Snatic, who was a general practitioner and Hooper's family physician, testified that he saw Hooper on the evening of July 18, 1967 at St. Patrick's. He diagnosed the trouble as being a straining injury to the right shoulder, neck and back, and based on the history given him by Hooper, as well as the headaches of which he was complaining, he also diagnosed a concussion. He visited Hooper in the hospital twice daily until July 22, 1967 when he was released. Thereafter he treated him in the office some 15 times, giving him traction treatments on about half of those occasions. Dr. Snatic considered all of Hooper's x-rays to be normal and on November 28, 1967 he released him as able to return to work. He admitted that Hooper had sustained an injury to his right shoulder in June of 1967, but stated categorically that he had fully recovered from that injury. Finally he indicated that he considered Hooper's complaints genuine, although he *143 was satisfied that he could return to work when he released him.
At the request of his attorney, Hooper was also treated by Dr. Charles V. Hatchette, an orthopedic surgeon from Lake Charles, Louisiana. Dr. Hatchette first saw Hooper on July 28, 1967 and after examining him reached the conclusion that he was suffering from the residuals of a lumbosacral injury and of a cervical strain. He treated Hooper with physical therapy and medication in the office. On August 17, 1967 Hooper admitted himself to St. Patrick's Hospital complaining of severe low back pain. He was given morphine and put in traction and a few days later he was released as being much improved. On August 24, 1967 Hooper was back in the doctor's office complaining of neck pain and headache and he was given some medication. On September 26, Hooper told Dr. Hatchette that he had stepped in a hole the previous day and that this had greatly increased his headaches and pain. At that time the doctor put him in a Thomas Collar, an extension brace to his cervical spine and head region, which considerably alleviated the symptoms. On October 16, 1967 Hooper told the doctor that he had blacked out and fallen on the floor while watching television the previous night, but examination revealed no cause for this occurrence. Finally, on November 27, 1967 Hooper told Dr. Hatchette that his neck was no longer bothering him but that his back was giving him a lot of trouble. The doctor examined him but could find nothing at all wrong, and so he discharged him as able to return to work.
In all, Dr. Hatchette treated Hooper some 30 times, seeing him again on May 31, 1968 and October 21, 1968. On those occasions Hooper complained of continued pain in the back, neck, and shoulder, but examinations revealed no basis for his complaints. Although he considered Hooper's injuries to be purely within the specialty of orthopedic surgery and therefore that an orthopedic surgeon would be best qualified to evaluate and treat the injuries, Dr. Hatchette could find nothing after November 24, 1967 to substantiate his complaints. He could not say, however, that Hooper was falsifying his symptoms, and suggested that perhaps he should consult another orthopedist.
Instead, on January 25, 1968, Hooper went to Dr. John D. Jackson, a neurosurgeon in New Orleans. As stated above, Dr. Jackson did not treat plaintiff, but only examined him at the request of his attorney. However, this physician testified by deposition and offered his conclusions from the examination. All x-rays of the cervical lumbar and skull areas were completely normal in every respect, but based on his history and complaints, the doctor felt that Hooper had suffered a cerebral concussion. Since Hooper had normal findings from an objective standpoint, Dr. Jackson thought him to be well on the road to recovery at the time he examined him, but he conceded that the headaches could possibly last from three to six months longer. That they would last that long, however, was highly unlikely.
The last physician that Hooper consulted in connection with this accident was Dr. S. M. Emerson, an ophthalmologist whom he also went to on his lawyer's advice. This physician testified that he first saw Hooper on July 24, 1967 with complaints of a foreign body sensation in both eyes. Examination revealed no foreign bodies but did substantiate his complaints in that both eyes were red and irritated. Dr. Emerson considered this condition to be compatible with the type of accident that Hooper had been involved in. He prescribed medication, and when he again saw Hooper on July 27, 1967, the condition in both eyes had cleared up.
Hooper himself testified that he had injured his neck, back, and shoulder in the accident, as well as suffered cuts in the face and chest, and a burning sensation in the eyes. He stated that he blacked out immediately after the accident and that he "* * * didn't know nothing". Since *144 that time he has had pain of varying intensity in the back, neck and shoulder, as well as headaches. His back and shoulder, he said, were still bothering him at the time of the trial.
Hooper refrained from returning to work until January of 1968 when he took a lighter job as a welder's helper. He said that although Drs. Hatchette and Snatic released him in late November of 1967, he did not feel capable of working until the following January, and that even then he was not completely well. Although the defense attorneys made an effort to show that Hooper could not have worked even if he had wanted to because there was no work for him to do, he denied this, insisting that he could and would have worked had he been able. It was stipulated that Hooper's earnings with Augenstein were $2.50 per hour and $3.75 for overtime work.
With all of this evidence before it, the jury concluded that an award of $5,000.00 to Hooper was proper. In doing so, they obviously relied to a great extent on the testimony of Hooper and although here again we have reservations regarding his credibility, we feel under the law cited above, that we should not substitute our judgment for theirs. With this in mind, we cannot say that the award made to this plaintiff is manifestly excessive and we therefore affirm it, subject to excluding the above referred to fees of Dr. Jackson and the Ochsner Clinic. These amounted to $125.00 and that sum must be deducted from the $5,000.00 awarded by the jury.
Appellants' final specification of error alleges that the jury erred in absolving Wilkinson from liability.
Perhaps Wilkinson was negligent, but we need not reach the question because we think that even if he was, his negligence was not the proximate cause of the accident. All of the evidence shows that following the initial blow to the riser, Wilkinson immediately notified Augenstein of the accident. He asked if there was anything he could do, but was told by Hob Nail, Augenstein's superintendent, that there was not, and that he could go home. Augenstein and Continental then took over the entire matter, with Continental, by Robicheaux's testimony, assuming the responsibility for repairing the leak. It was Augenstein that ordered the plaintiffs into the digging site and it was Continental that failed to reduce the pressure in the pipeline or otherwise provide for their safety. Surely then, the chain of causation from Wilkinson's act to the plaintiffs' injuries was effectively broken and Wilkinson was properly absolved of liability to them. Shackelford v. Williams, La.App., 204 So.2d 707; Adams v. Great American Indemnity Company, La.App., 116 So.2d 307. Accordingly the jury's findings in this regard were correct.
For the above and foregoing reasons the judgment of the trial court is amended so as to reduce the award made to Kennith E. Hooper from $5,000.00 to $4,875.00, and as thus amended is affirmed.
Amended and affirmed.