DOUCET, Judge.
This appeal arises out of a vehicular collision. On August 22, 1982, Thomas Holtzclaw was involved in an accident with Edward Davis. Shirley Davis, Edward Davis’ wife, was a passenger in the Davis vehicle. Holtzclaw, who was intoxicated, was driving a vehicle technically owned by Robert Thompson, Sr., but under the control of Robert Thompson, Jr. (Bobby Thompson). A twelve member jury found that the incident occurred entirely as a result of the negligence of Thomas Holtzclaw and that Holtzclaw had express or implied permission to use the vehicle, which permission was negligently granted by Bobby Thompson. As a result, coverage under the Thompson’s policy of liability insurance was invoked. The jury awarded damages to Edward Davis in the amount of $17,500.00 and to Shirley Davis in the amount of $300,000.00.
Defendants, Robert Thompson, Sr., Bobby Thompson, and their insurer, Aetna Casualty & Surety Company, appeal the verdict on the grounds that the jury erred in finding that Holtzclaw had express or implied permission to use the Thompson ear and in finding that Bobby Thompson was negligent in permitting Holtzclaw to use the car while intoxicated.
Shirley Davis appeals asking for an increase in the amount of damages awarded by the court.
In reviewing a judgment of a lower court, we, the appellate court, are mandated by the Constitution of 1974, art. 5 § 10(B) to review both the facts and the law. As this court stated in Wiley v. Travelers Insurance Co., 300 So.2d 555 (La.App. 3rd Cir.1974), writ denied 303 So.2d 187 (La.1974):
“Ours is not' the primary duty of weighing the evidence, judging the credibility of witnesses or evaluating the strength of the various experts’ opinions. On the contrary, these tasks are allotted initially to the triers of fact, here the jury; and the conclusions of the jury as to facts should not be disturbed unless manifestly erroneous. See Hooper v. Wilkinson, 252 So.2d 137 (La.App. 3 Cir.1971); and Busby v. St. Paul Fire & Marine Insurance Company, 290 So.2d 701 (La.App. 1 Cir.1974); writ denied, La., 294 So.2d 546.”
The task of the intermediate court is to examine the record and review the facts to determine whether the record reveals a reasonable factual basis for the trial court’s finding, and whether those findings are manifestly erroneous. Wiley v. Travelers Insurance Co., supra; Farnsworth v. Lumberman’s Mutual Casualty Co., 442 So.2d 1340 (La.App. 3rd Cir.1983), writ denied 445 So.2d 452 (La.1984). The Supreme Court explained the appropriate standard of appellate review in Canter v. Koehring, 283 So.2d 716 (La.1973):
“When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court’s *1113 finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.”
FACTS
The sequence of events surrounding the accident was revealed at trial. On August 21, 1982, Bobby Thompson invited Thomas Holtzclaw to accompany him to Lafayette to “party” at the apartment of Wendy Weiner, a friend of Thompson’s. The plan was apparently to drive into Lafayette that afternoon from Thibodaux, where both were second or third year students at Nic-holls State University, spend the night at Weiner’s apartment, and return the next morning. Bobby Thompson drove his car. Holtzclaw was a passenger. The car was registered in the name of Bobby’s father, Robert Thompson, Sr. and was insured on Thompson, Sr.’s policy which covered all of the family vehicles. According to the testimony, the car was a graduation present to Bobby from his father. It was bought a few months before Bobby’s graduation from high school while Bobby was a minor. It was used exclusively by Bobby at his own discretion from the time he left home to go to college. Robert Thompson, Sr. testified that he instructed Bobby not to loan the car to anyone at the time it was bought. During his testimony, Thompson, Sr. consistently referred to the vehicle as belonging to Bobby.
On the way to Lafayette, Thompson and Holtzclaw stopped and bought a six-pack of beer. Holtzclaw drank two or three. There is conflict in Bobby Thompson’s testimony as to whether he drank any beer or not. Upon arriving at Wendy Weiner’s apartment in Lafayette, Bobby began mixing drinks. The testimony at trial indicated that Bobby acted as bartender all evening, mixing and serving drinks for the group. Holtzclaw was given the keys to Bobby’s ear and sent to buy ice for more drinks. Neither Holtzclaw, Thompson, nor Weiner, remembered exactly what was done with the keys when he returned with the ice. Holtzclaw testified that he did not keep them. At some point, several other people arrived at the apartment. According to Bobby Thompson's testimony, at about 9 o’clock in the evening, some of those present began talking about going to J.R.’s, a Lafayette bar and night spot. J.R.’s is located across the street from the 7-11 where Holtzclaw bought the ice. Bobby testified that by that time he had drunk two or three margaritas in ordinary kitchen glasses and five or six kamikazes in jigger size glasses. Bobby and Wendy Weiner decided not to go out with the others. Holtzclaw decided to go. At 11:00 or 11:30, Holtzclaw and the other guests left for J.R.’s. Bobby testified that by that time he had had three daiquiris and ten or twelve kamikazes. In deposition, Holtzclaw indicated that he had about three margaritas in kitchen glasses before going to J.R.’s. Holtzclaw left the apartment in Bobby Thompson's car, apparently taking several others with him. Holtzclaw testified that he and Bobby discussed Holtzclaw taking the car and that Bobby knew he was taking it. Bobby Thompson testified that he did not know Holtzclaw was taking the car. He stated that he thought Holtzclaw was riding with someone else.
Holtzclaw went to J.R.’s and drank more with several others. At some point he dropped some of the other guests off at Weiner’s apartment complex and returned to J.R.’s without going into the apartment. He left J.R.’s at about 1:30 A.M. on August 22, 1982. He left the private parking lot of *1114 J.R.’s and was crossing the five traffic lanes of Johnston Street to reach Oak Crest when his car was hit by the Davis vehicle, which Holtzclaw had failed to see. When the police arrived, Holtzclaw was arrested and charged with failure to yield from a private drive and operating a vehicle while intoxicated. He was determined to have a blood alcohol level of .161.
After spending the remainder of the night in jail, he called Ben Marmande to pick him up. Marmande took him back to Weiner’s apartment. At the apartment, Holtzclaw told Thompson about the wreck. Marmande testified that Holtzclaw repeatedly apologized for taking the car without permission. This testimony was not backed up by that of Bobby Thompson, Jr. or Wendy Weiner. Holtzclaw denied making apologies of this type. When Bobby called his father to tell him about the wreck, he told his father that Holtzclaw took the car while he, Bobby, was asleep. At trial, Bobby admitted being awake and aware that Holtzclaw was leaving. Holtzclaw and his father testified that, during a meeting with Thompson, Sr. and Bobby regarding the insurance deductible on the wrecked car and the loss of a shotgun from the car, Thompson, Sr. said that he knew Holtzclaw had permission to use the car but that if a lawsuit were filed, he would have to say Holtzclaw did not have permission. Both Thompsons denied this. Thompson, Sr. stated in deposition that the car was not replaced for several months and that Bobby had to come up with the difference between the salvage paid for the wrecked car and the price of the new car because “he (Bobby) allowed his car to be destroyed.”
PERMISSION TO DRIVE
The question of permission determines the insurance coverage applicable to the liability of Thomas Holtzclaw. If Holtzclaw had express or implied permission to use the Thompson vehicle, he would be covered under the Thompson insurance policy underwritten by Aetna. If he did not have permission, the Holtzclaw policy underwritten by Allstate Insurance Company would apply. The Holtzclaw policy had limits of $50,000.00. The Thompson policy with Robert Thompson, Sr. as named insured, had limits of $1,000,000.00. Both policies had clauses excluding coverage if other coverage applied. This court in Coco v. State Farm Mutual Automobile Insurance, 136 So.2d 288 (La.App. 3rd Cir.1961), established that:
“... [w]here the original permittee has been granted more or less general discretion and continuous control over the insured vehicle by the named insured, such general permission carries with it the implied consent of the named insured for the original permittee to allow third persons to use the insured vehicle. Under those circumstances, a third person using the vehicle with the permission of the original permittee is considered as having the indirect and implied permission of the named insured to use the car, and thus becomes an insured under the provisions of the omnibus clause. Perrodin v. Thibodeaux, La.App. 1 Cir., 191 So. 148; Boudreaux v. Cagle Motors, La.App. 1 Cir., 70 So.2d 741; Garland v. Audubon Insurance Company, La.App. 1 Cir., 119 So.2d 530 (Cert, denied); Thomas v. Peerless Insurance Company, La.App. 2 Cir., 121 So.2d 593; Donovan v. Standard Oil Company of Louisiana, La.App. 2 Cir., 197 So. 320 (Cert. denied).
In a case, however, where the original permittee has been granted the more or less general use of and continuous control over the insured vehicle by the named insured, but with the specific restriction or prohibition that he is not to permit anyone else to drive it, then we think the general permission granted to the original permittee does not carry with it the implied consent of the named insured that others may be permitted to drive the insured car.”
Robert Thompson, Sr. argues that Aetna coverage could not apply because Bobby had been expressly instructed not to lend his car.
*1115 The jury was properly instructed by the trial judge that an insurance company has the burden of proving by a preponderance of the evidence any facts which would relieve it from liability.
“In determining whether or not an automobile operator has permission, either actual or implied, to drive the vehicle, for purposes of determing [sic] insurer’s liability, all facts and circumstances surrounding the use of the automobile must be considered.
The general rule is that the child of the named insured cannot violate the express restrictions of the named insured by allowing another to use the insured vehicle, so as to cause the user to become an omnibus insured.
Accordingly, if you find that Robert Thompson, Jr. violated the express restrictions of Robert Thompson, Sr. by allowing Thomas Holtzclaw to drive the insured vehicle, then you must find that Thomas Holtzclaw was not an omnibus insured under the policy of insurance issued to Robert Thompson, Sr., providing coverage to the insured vehicle.”
The jury found as fact that Holtzclaw had express or implied permission to use the Thompson vehicle. In light of the often conflicting testimony adduced at trial, we believe that the evidence before the jury, when subjected to its reasonable credibility evaluation, furnished a reasonable basis for this factual finding. We therefore, may not substitute our judgment for that of the trial court.
NEGLIGENCE OF BOBBY THOMPSON
The Thompsons further argue that the jury erred in finding that Bobby Thompson was negligent in granting permission to Holtzclaw to drive his car while Holtzclaw was intoxicated.
In Central Mutual Insurance v. Cain, 377 So.2d 579 (La.App. 3rd Cir.1979), we explained the standard for ascertaining whether a car owner is negligent in loaning his car:
“It is well settled in our jurisprudence that the owner of a vehicle is responsible to a third party for the negligence of driver when he knew or should have known that the driver was incompetent. Kemp v. Fourmy, 265 So.2d 651 (La.App. 2nd Cir.1972). An owner of an automobile knows a driver is incompetent when he knows or should have known that the driver was under the influence of alcohol. Morton v. American Employers Insurance Company, 104 So.2d 189 (La.App. 2nd Cir.1958).
In order for liability to attach to the owner of the car for the negligent acts of the driver it must be proven that the owner voluntarily lent possession of the auto and that the owner knew or had reason to know that the driver was incompetent.”
We believe that the jury had a reasonable factual basis for determining that: 1) Bobby Thompson voluntarily lent his car to Holtzclaw; and 2) that since Bobby Thompson, acted as bartender and served Holtzclaw all the drinks he consumed at the apartment and knew that Holtzclaw was going out for more drinks that evening, he knew or had reason to know that Holtzclaw was intoxicated. We find no manifest error.
TESTIMONY OF RICHARD HOLTZCLAW
The Thompsons also contend that the judgment of the trial court should be reversed because Richard Holtzclaw, Thomas Holtzclaw’s father, was allowed to testify after hearing part of his son's testimony in violation of the rule of sequestration. The record reveals that on the third day of trial, American Manufacturers Mutual, uninsured motorist insurer of the Davis vehicle, and Allstate Insurance, moved to sequester the witnesses. Ben. Marmande was put under the rule. Thomas Holtzclaw was then called to testify on cross-examination. After Holtzclaw had been on the witness stand for a short time, it was discovered that Richard Holtzclaw was in the courtroom. By counsel for the Thompsons, the court first stated that Richard Holtzclaw would not be allowed to testify. However, it was finally ordered that Richard Holtzclaw not be allowed to testify as to *1116 any matter concerning which he had heard his son testify. Counsel for the Thomp-sons voiced no further objection.
La.C.C.P. art. 1631 provides the rule of sequestration:
“On its own motion the court may, and on request of a party the court shall, order that the witnesses, other than parties, be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interest of justice, the court may exempt any witness from its order.”
No provision is made for penalties in the case of violation of this rule. Therefore, we believe that the choice of remedy for the violation of the rule of sequestration is within the discretion of the trial judge. Since Richard Holtzclaw’s testimony did not touch on subjects covered by his son after the rule of sequestration went into effect, and since Richard Holtzclaw testified without objection by counsel for the Thompsons, no party’s rights were prejudiced by his testimony. As a result, we cannot find that the trial judge abused his discretion by allowing Richard Holtzclaw to testify within specified limitations.
DAMAGES
We now proceed to a review of the damages awarded to Shirley Davis by the jury. As a result of the accident, the femoral head of Shirley Davis’ left hip was broken off. She was in severe pain. Surgery was required to implant a prosthetic hip joint. She was in the hospital for about two months. Later, she fell, ostensibly when her left leg gave out, and broke her right ankle, involving a further hospital stay. She contends that the award of $300,000 was insufficient recompense for her injuries, and asks that the award be increased. The Supreme Court in Coco v. Winston, 341 So.2d 332 (La.1976), enunciated the standard for appellate review of quantum issues:
“We do reemphasize, however, that before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award. Anderson v. Welding Testing Laboratory, Inc. [304 So.2d 351 (La.1974)], supra; Bitoun v. Landry [302 So.2d 278 (La.1974)], supra; Fox v. State Farm Mutual Automobile Ins. Co. [288 So.2d 42 (La.1973)], supra; Walker v. Champion [288 So.2d 44 (La.1973)], supra. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. Bitoun v. Landry, supra; Spillers v. Montgomery Ward & Company, Inc. [294 So.2d 803 (La.1974)], supra. It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence.”
The medical testimony revealed that Mrs. Davis had a history of debilitating disease. At the time of the accident, Mrs. Davis was a 44 year old housewife. She had raised two children to adulthood. It had been a considerable time since she worked outside the home. Her life revolved around caring for her home and family. Some 15 years prior to the accident, it was determined that Mrs. Davis had lupus. This condition was concentrated on her feet and had caused extreme pain. According to the testimony of Dr. Ventre, the disease was being kept under control by a variety of drugs, including steriods and antibiotics because lupus involves a lack of resistance to infection, antidepressants for depression associated with the lupus, and a pain reliever. She continued to have lesions on her feet. However, they did not prevent housework or limited participation in social events. In addition, the lupus had resulted in osteoporosis or brittle bones. Dr. Ven-tre testified that her bones were more typical of a woman 65 than one 20 years younger. In 1978, Mrs. Davis underwent *1117 brain surgery for a cerebral aneurism. Af-terwards, she took medication to prevent epileptic-type seizures, which sometimes occur after this type of surgery. She was also subject to a slight amount of Parkin-sonism, or palsey. Mrs. Davis had apparently adjusted to these difficult circumstances extremely well, until the time of the accident.
After the accident, Mrs. Davis became extremely depressed. She was limited in her recovery due to her inability to participate wholeheartedly in physical therapy. Dr. Mayer, the orthopedic surgeon, testified to a 30-40% permanent disability of her hip. Symptoms of Parkinsonism increased. She suffered from a feeling of being off-balance, an extreme fear of re-injury, and pain in her feet. She could perform only limited housework. In September 1983, she was standing in her garage when, according to her testimony, her left leg “went out” on her. She fell, breaking her right ankle and suffered what Dr. Ven-tre, her family physician, believed was a flare-up of the lupus condition. In order to treat the lupus, it was impossible to fully treat her ankle. She was left with a weak right ankle, 50% permanent loss of use. In combination with the hip disability, this condition left Mrs. Davis unable to take care of her home, or to move in a normal way. She and Mr. Davis were forced to hire household help. Mrs. Davis’ household activities were limited to folding laundry. She developed a choppy gait. Dr. Mayer stated that this was a typical symptom of Parkinsonism. However, Dr. Ven-tre and her husband testified that it developed only after the accident.
Dr. Byrd, a psychiatrist, described Mrs. Davis as having the beginning of what subsequently led to a state of despair, almost a loss of hope, as a result of the series of unfortunate events which had occurred in her life.
The trial judge correctly instructed the jury as follows:
“Now, it is the law in the State of Louisiana that where an injury activates or arouses a dormant condition, the injured person is entitled to recover for so much of his affliction as is the result of the accident. The tort-feasor can be held responsible only to the extent his negligence injured the plaintiff, and where a pre-existing condition is involved, the damage awarded for aggravation should not include the normal and natural results of the plaintiffs poor — prior condition. Excuse me.
A person who causes an accident takes his victim as he finds him, and he is responsible in damages for the consequences of his negligence, even though the damages so caused are greater because of a prior condition of the victim. [Reck v. Stevens, 373 So.2d 498 (La.1979) ]
In other words, the fact that a person’s reaction to injury resulting from an automobile collision was more severe than that of most people, did not lessen the responsibility of the person who caused the accident to compensate the injured person for all consequences of the accident.”
The jury had the difficult task of sorting out which of her complaints resulted from an aggravation of her prior conditions and which were natural results of her accident, which developed unaffected by the accident. The jury returned a verdict of $300,-000. We believe that an award of this size is not only appropriate, but indicates the jury’s appreciation of the emotional and physical trauma caused to Mrs. Davis by the accident. Accordingly, we find no abuse of discretion.
For the above and foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.