290 So.2d 701 (1974)
Morris E. BUSBY
v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY et al.
No. 9715.
Court of Appeal of Louisiana, First Circuit.
February 11, 1974.
Rehearing Denied March 18, 1974.
Writ Refused May 17, 1974.
*702 Kenneth L. Riche and John L. Avant, Baton Rouge, for appellant.
Walter E. Busby, Donald S. Zuber and Wm. C. Kaufman, III, Baton Rouge, for appellees.
Before SARTAIN and TUCKER,[*] JJ., and WATSON, J. ad hoc.
WATSON, Judge ad hoc.
This is a malpractice action involving a post-surgical infection and its aftermath. The plaintiff is Morris E. Busby and the defendants are Dr. Richard B. Means, an orthopedic surgeon; the Bone and Joint Clinic (hereafter sometimes called "the Clinic"), a medical partnership of which Dr. Means is a member; and St. Paul Fire and Marine Insurance Company, the malpractice insurer of Dr. Means and the Clinic.
The facts are as follows: Some years prior to June 2, 1970, the date of the operation on Busby by Dr. Means, Busby had sustained an injury in an automobile accident which required the inserting of a nail and plate in the femur just below the left hip joint and as time passed, the nail had protruded into the hip joint. Plaintiff was referred by his family physician, Dr. Russell M. Coco, to Dr. Means, who saw him on several occasions, giving him various conservative treatment for his difficulties, *703 but recommending that the removal of the nail and plate might relieve some of the pain he was having in the hip. On June 2, 1970 at Baton Rouge General Hospital, Dr. Means performed the necessary operation on Busby to remove the device.
The following day plaintiff was discharged from the hospital with an appointment to return to see Dr. Means at his office on June 17. From the record, it is apparent that Busby wanted to leave the hospital as soon as possible after the operation and Dr. Means discharged him somewhat reluctantly. However, some five or six days following discharge from the hospital, Busby began having increased pain and swelling at the incision site. On June 12 he decided to return to see Dr. Means and called the Bone and Joint Clinic, requesting an appointment. However, the wife of Dr. Means had died in the interim between plaintiff's surgery and his call to the office and the Clinic advised plaintiff that Dr. Means was not available. Plaintiff contends that he was told also that no one else could see him. Busby, not knowing the reason for the absence of Dr. Means, called the physician's home and was advised of the circumstances. Thereafter, Busby contacted his family physician, and Dr. Coco undertook treatment of the infection, which included the cleansing of the wound, giving antibiotics and ordering an x-ray. This x-ray was interpreted as negative for bone infection.
Dr. Coco advised plaintiff that he would treat him on what he called an "emergency basis," but that he should see Dr. Means as soon as possible. On June 15, plaintiff again returned to Dr. Coco because he was having considerable difficulty.
Dr. Coco called the Clinic on a date thought by him to be June 17, talked to the appointment desk, explained the situation and obtained an appointment for Busby on June 24. The appointment which was given on the telephone call by Dr. Coco was to see Dr. Means who would be back in the office on the 24th.
Counsel for plaintiff takes the position that there was fault on the part of the Clinic in failing to give Busby an earlier appointment at the time of Dr. Coco's telephone call. However, our appreciation of the testimony by Dr. Coco does not indicate that he expressed to the personnel at the Clinic an urgent necessity for Busby to be seen immediately. This inference is reinforced by the fact that he was content to speak with the appointments secretary rather than talking to one of the physicians in the office as we would think would have been indicated if Dr. Coco had thought it urgent that Busby be seen immediately.
Dr. Means saw Busby on June 24, cleaned the wound, prescribed antibiotics and pain medication. Busby was seen again on July 1 by Dr. Means when he again prescribed pain medication. There is a dispute at this point concerning the treatment of the plaintiff by antibiotics in that Dr. Means contends that on the visit of June 24, plaintiff was given a refillable prescription for antibiotics and he instructed plaintiff to continue them, while plaintiff contends that the prescription given him was for only a period of one week according to his understanding and he did not continue to take antibiotics thereafter.
Plaintiff called the Clinic about one week later and was given another pain prescription at that time. He was seen in person again on July 1. Dr. Means next saw Busby on July 21 at which time plaintiff advised the doctor he was going to Hammond, the doctor's understanding being that he was going to move to Hammond to be near relatives while he continued his treatment, and Busby's understanding, according to his testimony, being that he told Dr. Means that he was going to Hammond to seek other medical treatment.
Dr. Means testified that through the final visit of July 21, plaintiff's condition improved. There was evidence indicating to Dr. Means that the wound was healing in a satisfactory manner. The treatment given to plaintiff was described by the physician *704 as routine, that is, the same treatment that he would have given in any other case similar in circumstances. His treatment of Busby was based on his clinical observations of the patient and the wound, which he said had various indicia of healing. The healing progressed steadily, according to Dr. Means, from the first time Dr. Means saw the plaintiff after the operation until the day before Busby went to Hammond.
The next day in Hammond, Louisiana, plaintiff came under the treatment of Dr. Merlin H. Allen, a general practitioner, who had him admitted to Seventh Ward General Hospital. At that time, according to Dr. Allen, he was in acute distress, complaining of severe pain in his left hip. He had a break in the skin of about an inch or an inch and a half long over the area of his left hip, through which there was draining various exudate. This, according to Dr. Allen, was the lower portion of a previous operative site. The wound, further according to the physician, had healed everywhere except at the one site where it was draining. Dr. Allen caused a culture to be made of the wound and an x-ray to be made of the hip. When the x-ray was reported there was a suspicion of osteomyelitis. Dr. Allen called Dr. Luis Matta into the case, and although it had not been possible to clear up the infection, these physicians concluded that it was best to go ahead with additional surgery. An operation was performed on August 7, 1970 in which the head of the femur, that is, the top of the thigh bone, was removed because it was abcessed. Laboratory tests on the bone confirmed later that plaintiff was suffering osteomyelitis. Following the surgery, plaintiff had additional difficulty in the nature of pulmonary edema and congestive heart failure, which resulted according to Dr. Allen from a combination of age (Busby was in his late sixties) and the severe infection which had weakened him.
On August 19, 1970, plaintiff was transferred to Touro Infirmary in New Orleans because he developed difficulty with his kidneys. He was having heart failure as well as severe kidney failure at this point. Plaintiff was treated in New Orleans for his kidney difficulties, and, although he was severely ill at the time of his transfer, he recovered in due course.
He was left, as a result of the second operation, with no joining of the femur and the hip joint. He cannot walk unassisted.
This action was brought against Dr. Means, the orthopedic surgeon who operated to remove the plate and nail in the hip; against the partnership of physicians with whom Dr. Means practiced; and against their liability insurer.
It was tried before a jury which found a general verdict for the defendants. From the judgment in favor of the defendants, plaintiff has perfected this appeal.
There is copious testimony in the record setting forth the various contentions of the parties.
For the plaintiff, lay testimony as to his condition was given by himself; by his wife; by his daughters, Vivian Skelton and Carolyn Sconyers; and by his stepdaughter, Amelia Schauwatt. Plaintiff also called various physicians: Dr. Merlin H. Allen, general practitioner who treated him in the Hammond hospital; Dr. Russell M. Coco, his family physician; Dr. Thomas Oelsner, the specialist in internal medicine from New Orleans who treated him for his kidney difficulty; Dr. Luis F. Matta, the orthopedic surgeon who operated on him in Hammond; and Dr. R. E. L. Stewart, the radiologist of the Hammond hospital.
Testifying on behalf of the defendants were Dr. Means; Dr. Allen C. Farries and Dr. Alvin Stander, partners in the Clinic; Emily Wood, the business manager of the Clinic; William B. Hanegan, Jr., a pharmacist; Timothy P. LaBorde, another pharmacist; Dr. Albert L. McQuown, a pathologist who gave expert testimony at *705 considerable length to the effect that Dr. Means was well qualified and that his treatment accorded to plaintiff was within the standard of medical practice of the Baton Rouge area; Dr. Herbert K. Plauche, an orthopedic surgeon; and Dr. William E. Smith, another orthopedic surgeon.
The law applicable to the standard of care required of Dr. Means is, in our opinion, correctly stated by counsel for plaintiff in their brief:
". . . the law only exacts of physicians, surgeons and dentists that degree of skill and care which is usually possessed and exercised by practitioners of their profession in the same locality or community and makes it their duty to use reasonable care and diligence, along with their best judgment, in the application of their skill to the case before them." Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 at 786 (1954).
Plaintiff's contention is that Dr. Means was negligent in the diagnosis and treatment of plaintiff's infection. The weight of expert opinion given at the trial is to the effect that Dr. Means did not violate the standard of care followed by other physicians practicing his specialty in the Baton Rouge area.
Both Dr. Herbert K. Plauche and Dr. William E. Smith, who were qualified as experts in the field of orthopedic surgery and who were practicing in the Baton Rouge area, testified that Dr. Means had not violated the standard of care observed by orthopedic surgeons practicing in that area in his handling of plaintiff's case. Also, these doctors testified that Dr. Means was and is well qualified in the field of orthopedic surgery. Their testimony was in agreement with the expert in the pathology specialty, Dr. McQuown, who explained in great detail the nature of staph infections, their development and treatment. He also gave his opinion that Dr. Means had not deviated from the standard of care of similar practitioners of the area. The jury heard these experts as well as those presented by plaintiff and, apparently, they either agreed with defendants' experts or they found contributory negligence on the part of plaintiff.
Plaintiff also contends that his evidence proves malpractice on the part of Dr. Means and the Clinic in that they failed to provide "coverage" during the period when Dr. Means was out of the office and unavailable to Mr. Busby. "Coverage" in the medical profession means having another physician take calls and see patients for a physician who is for some reason unavailable. There was presented to the jury much testimony by plaintiff and his witnesses and by Dr. Farries and Dr. Stander, two of the partners in the Clinic, as well as Emily Wood, the business manager of the Clinic, concerning whether the other physicians in the office "covered" for Dr. Means during the period shortly following his wife's death. There was evidence that the other physicians saw some of his patients and even operated on one who had been scheduled to have an operation for a removal of a plate or pin, somewhat similar to the operation performed on plaintiff. From the testimony reflected in the record we believe that the jury certainly could have reasonably concluded that the other doctors in the office of Dr. Means provided "coverage" for him during the period in question. From the evidence, the jury could have concluded also that plaintiff had failed to prove to their satisfaction that the physicians at the Bone and Joint Clinic had negligently failed to see him and to attend to his symptoms.
We find that the jury heard a very thorough presentation of both plaintiff's contentions and defendants' contentions. The jurors reached a unanimous conclusion after hearing the witnesses and viewing the other evidence that a verdict should be granted for the defendants. We find no manifest error in their conclusion.
*706 Plaintiff makes the final contention that under the law of Louisiana where evidence is credible, reasonable, uncontradicted and unimpeached, there is no question of fact for the jury, only a question of law being presented. While this may be a correct statement of the jurisprudence, we do not find after a careful review of the record that the evidence in the present case meets these criteria; specifically, it certainly cannot be successfully maintained that the evidence on any contention of either side is uncontradicted. There is ample evidence in the record on both sides of the various contentions of the parties.
The jury had the benefit of hearing the testimony, personally observing the witnesses, judging their credibility, and weighing the opinions of the expert witnesses; we find no manifest error. Hooper v. Wilkinson, 252 So.2d 137 (La.App. 3 Cir. 1971).
As the Supreme Court recently said in Canter v. Koehring Company, La., 283 So. 2d 716 at 724 (1973):
"When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts."
For the reasons assigned, the judgment in favor of defendants is affirmed, costs being taxed against the plaintiff-appellant.
Affirmed.
NOTES
[*] TUCKER, J. died on the 25th day of January, 1974.