304 So.2d 743 (1974)
William E. LYLE, Plaintiff and Appellee,
v.
NATIONAL SURETY CORPORATION et al., Defendants and Appellants.
No. 4793.
Court of Appeal of Louisiana, Third Circuit.
December 16, 1974.
Dissenting Opinion December 18, 1974.
Rehearing Denied January 9, 1975.
Writ Refused March 7, 1975.
*744 Plauche, Smith & Hebert by A. Lane Plauche, Lake Charles, for defendants-appellants.
*745 Dodd, Hirsch, Barker, Avant & Wall by James D. Thomas, II, Baton Rouge, Jules E. Guglielmo, Jr., and E. C. Hamilton, Lake Charles, for plaintiff-appellee.
McHale & Bufkin by Louis D. Bufkin, Raggio, Farrar, Cappel & Chozen by Frederick L. Cappel, Scofield, Bertstedt & Gerard by John B. Scofield, Lake Charles, Holt, Wagner & Lee by Richard E. Lee, Pineville, for defendants-appellees.
Before HOOD, CULPEPPER and WATSON, JJ.
CULPEPPER, Judge.
This is an "executive officer" suit. The plaintiff, William E. Lyle, was an ironworker employed by Hoover Construction Company, the steel erection subcontractor on the Lake Charles Civic Center job. While attempting to bolt up a jack truss, Lyle fell about 55 feet to the ground and received serious personal injuries. In this tort action plaintiff names as defendants: (1) George W. King, project manager for the general contractors, Southern Builders, Inc. and Tudor Construction Company, Inc., (2) Cecil Tull, steel expeditor and co-ordinator for the general contractors; (3) National Surety Corporation, liability insurer of King and Tull; (4) Vincent Piserell, foreman of Hoover's bolt-up gang; (5) Denver Nevils, foreman of Hoover's raising gang; (6) James T. Platt, the architect; (7) Safety Steel Service, Inc., fabricators of the steel being erected; (8) Southern Builders, Inc. and Tudor Construction Company, general contractors under a joint venture agreement; (9) Firemen's Fund Insurance Company, liability insurer of Hoover Construction Company, an unincorporated business.
The district judge sustained motions for summary judgment dismissing Southern Builders, Inc., Tudor Construction Company, Inc. and the insurer of Hoover Construction Company, on the grounds that plaintiff's exclusive remedy against these parties was for workmen's compensation benefits.
After a trial on the merits, a jury held: (1) Piserell and Nevils, foremen for Hoover, were free of negligence. (2) King and Tull, employees of the general contractor, were negligent. (3) Platt, the architect, was free of negligence. (4) Safety Steel Service, Inc., the steel fabricator, was free of negligence. (5) Lyle, the plaintiff, was free of contributory negligence. (6) Lyle is entitled to damages in the sum of $269,000. Pursuant to this verdict, judgment was rendered against King and Tull and their liability insurer, National Surety Corporation, for the sum of $269,000, the judgment against the insurer being limited to its coverage of $100,000. The defendants, King, Tull and National Surety Corporation, appealed.
The issues are: (1) Did King and/or Tull breach any personal duty owed to the plaintiff under the rules set forth in Canter v. Koehring Company, La., 283 So.2d 716 (1973)? (2) Was plaintiff guilty of contributory negligence?
There is little dispute as to the essential facts. Southern Builders, Inc. and Tudor Construction Company, a joint venture, entered into a contract with the City of Lake Charles to construct the Civic Center for the price of about 11 million dollars. Under this contract, the joint venture assumed all responsibility for safe working conditions.
One of the approximately 40 subcontracts was with Hoover Construction, an unincorporated business owned by Hoover Savant. The subcontract provided: "This subcontractor agrees to furnish all labor, materials, supervision, tools and equipment in order to accomplish the work described as follows:" Then follows a description of the work which consists of the unloading and erection of all structural steel.
The defendant, George W. King, was the project manager for the general contractor. He had over-all responsibility for the job. The defendant, Cecil Tull, was the steel expeditor and coordinator for the *746 general contractor. His duties were to see that the steel was made available to Hoover at the right time and place and to see that the steel was erected in accordance with the contract.
Denver Nevils, an ironworker foreman of many years experience, was employed by Hoover as foreman of the raising gang. Nevils and his men raised the steel into position according to the plans and specifications and secured it with bolts sufficient for safety of the bolt-up gang, which later bolted all steel firmly into its final position.
Vincent Piserell, also an ironworker foreman of many years experience, was employed by Hoover as foreman of the bolt-up gang. Plaintiff was a member of this gang. Piserell personally supervised the work done each day by plaintiff.
Plaintiff and Oscar Stine worked as a team on the bolt-up gang. On the morning of the accident, May 27, 1971, Piserell ordered them to do some final bolt-up work in the area of the roof over the theater section. This work included bolting up a jack truss which had been set in place by Nevils' raising gang. The jack truss consisted of a top and a bottom chord connected by diagonal steel braces. Over-all, the jack truss was about 28 feet in length and 6 feet in height. The truss was being installed horizontally between heavy steel beams which had already been finally fixed in place. The raising gang had placed two bolts in the point at each end of the top chord of the jack truss and one bolt in the point on the south end of the bottom chord. However, the raising gang had not put a bolt in the point at the north end of the bottom chord, because there was either a slight bend in the jack truss or it was slightly out of line with the lug of the beam to which it was to be bolted. The bolting of this fourth point was left by the raising gang to be done by the bolt-up gang. This a common practice in ironworking so long as the piece of structural steel is made sufficiently secure that it will be safe for an ironworker to walk on.
After receiving their instructions from Piserell as to the work to be done that day, which included bolting up the jack truss in question, Lyle and Stine climbed up and started to work. Lyle was working alone on the jack truss. He first completed bolting and tightening the three points of the jack truss in which bolts had aready been set by the raising gang. Then he started to "make" the point on the north end of the bottom chord, the one that was slightly out of line and had been left by the raising gang without a bolt.
The bottom chord of the truss is 8 or 9 inches wide and is made of angle iron. In the center of the chord is a slit or hole which must slip over or "swallow" a lug. The lug is a small piece of steel plate, approximately 5 inches by 7 inches, which is welded to the bottom of stationary beam. There are 3 bolt holes in the lug which must fit 3 similar holes in the truss after it has swallowed the lug.
The bottom chord of the jack truss was hung up on the east side of the lug. In order to make this fourth point, plaintiff had to force the bottom chord down under the lug and about 4 or 5 inches to the west, so that the bolt hole of the truss would swallow the lug. This is routine for ironworkers. For this purpose they carry certain tools, i. e., a bull pin and a hammer with which to pry structural steel members into place so they can be bolted.
Lyle was working alone and he was either sitting or kneeling on the bottom chord of the jack truss. He had placed a bull pin in the middle hole of the lug on the east side, and he was hitting the bull pin with his hammer, in an effort to pry the chord down and under the lug. The bottom chord of the jack truss suddenly went under the lug. It moved all the way across the lug and then swung back and engaged on the west side of the lug. This *747 sudden movement of the jack truss, on which plaintiff was either sitting or squatting, caused him to fall.
Stine, who was the only eyewitness to the accident, described it as follows:
"Q Will you tell the jury what you saw?
A Well, Mr. Lyle was . . . had a bull pin in a hole on this jack truss trying to bring it down to line it up. He was hitting it with his left hand, and it moved 18 or 20 inches when it went down and under and kicked him off."
Essentially, plaintiff contends that the general contractor had a duty to furnish safety devices to make the work of the ironworkers reasonably safe considering the usual hazards of the employment; that the general contractor delegated this duty to King, the project manager, and Tull, the steel expeditor and coordinator; that pursuant to this duty, King and Tull were obligated to furnish safety belts or nets to protect against the reasonably foreseeable hazard of plaintiff falling; that this was a personal duty on the part of King and Tull and was one which was not delegated to responsible subordinates.
We are cognizant of the scope of our appellate review stated in Canter v. Koehring Company, La., 283 So.2d 716 (1973) as follows:
"When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable."
In Canter, our Supreme Court also set out as follows the criteria for imposing individual liability in these so-called "executive officer" cases:
"1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.
"2. This duty is delegated by the principal or employer to the defendant.
"3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstances whether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
"4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance *748 or mal-performance and has nevertheless failed to cure the risk of harm."
In the present case, the first criterion of Canter is present. The employer of King and Tull, i. e., the general contractor, owed the duty to all of the employees on the job to make the working conditions reasonably safe under the circumstances.
The second criteria of Canter is present as to King but not as to Tull. The duty of the general contractor to furnish safe working conditions was delegated to King, as project manager. But there is no evidence that this duty was delegated to Tull, the steel expeditor and coordinator.
The third and fourth criteria of Canter are absent as to both King and Tull. Neither had a personal duty toward the injured plaintiff to do anything, or to refrain from doing anything, which contributed to the cause of this accident. In the language of criterion No. 4 quoted from Canter above, King had only "general administrative responsibility" for the furnishing of safe working conditions and/or any necessary safety devices. The evidence shows clearly that this general responsibility on the part of King was delegated to responsible subordinates. In this case, these responsible subordinates were Nevils and Piserell.
In Hoover's subcontract it assumed the responsibility for furnishing "all labor, materials, supervision, tools and equipment" to erect the structural steel. In addition to these contractual provisions by which Hoover assumed responsibility for supervision and safety of the ironworkers, the testimony of the witnesses shows clearly that King had only general administrative responsibility for safety on the entire job. Nevils and Piserell had the personal responsibility for the safety of the ironworkers.
All of the witnesses recognized that ironwork is hazardous employment and that ironworkers and their foremen would on their request be furnished any safety devices which they desired. Although it is true that King, in his general supervisory capacity over the entire project, had the authority to require that safety measures be used, he did not interfere with the work of the steel erection subcontractor or his supervisory personnel unless he became aware of an obvious hazard or unless he was requested to furnish some safety devices.
The fact that Nevils and Piserell were delegated and assumed the duty for the safety of their men is shown not only by the testimony of King and Tull but by the testimony of Nevils and Piserell. For instance, Piserell testified:
"Q. Did you ever have any conversations with Mr. King or Mr. Tull?
"A. A lot with both.
"Q. What was Mr. King's function with regard to your work?
"A. I did work for Mr. King personally on back charges. Things he had to sign a ticket on back charges.
"Q. Mr. King had supervision over certain aspects of your work?

"A. No. He had no supervision on what I did. What I did had to be paid for by the general contractor. I had to get his signature on it to get our money on back charges." (Emphasis supplied)
Further testimony by Piserell showing that he had the duty for the safety of his men is his statement that on the morning in question he instructed Lyle and Stine to use a "float" to make up the points on the jack truss. A float is a piece of plyboard approximately 4 feet square suspended by ropes to each of its 4 corners and on which an ironworker could either stand or sit while doing hazardous work. Piserell testified:
"Q. How many floats were available, if you know?
*749 "A. I don't know the number. I remember having them made up but I don't know the number of them.
"Q. How did you go about getting these floats made up?
"A. I got a carpenter to cut the boards, and I put the rope on it.
"Q. Who did you go to or coordinate with in order to get the floats made, if anybody?
"A. I went to Mr. King and asked him to cut the boards for me. He's the general contractor, and as a favor he did it, because we didn't have any carpenters on our side of the job.
"Q. So you went to Mr. King to get the floats made, is that correct?
"A. He didn't have to make them up, though."
Further evidencing Piserell's duty towards the members of his gang is his testimony about safety belts. He did not think they were necessary on this particular occasion, but he testified as follows:
"Q. Mr. Piserell, what was your job on the civic center job?
"A. I was the foreman.

"Q. Did you have anything to do with procuring safety belts?
"A. If I would had been asked I would have given anybody one. I would have seen to it they got them, even if I had to rent it, you know." (emphasis supplied)
Nevils also testified to the same effect as Piserell that they had the responsibility for the safety of their men. Nevils stated:
"Q. One of the last questions Mr. Thomas had was something about Mr. King and Mr. Tull representing the general contractor, and I didn't really understand it. Had some sort of responsibility, I think they said, overall for the erection and safety of the steel, and I think you said yes. Actually, Mr. Nevils, who had the responsibility for erecting the steel on this job, including the providing of the labor, tools, equipment, and looking after safety of the men, the general contractor or Hoover Construction?
"MR. THOMAS: Excuse me, Your Honor, he's trying to impeach his own witness.
"MR. PLAUCHE: I'm not trying to impeach him, I'm just trying to clarify what he said.
"THE COURT: The objection is overruled.
"A. I think the two questions are different. Now, Hoover Construction Company had the job to erect the iron.
"Q. And to look after the safety of their men.
"A. That's right."
The evidence is clear that the general responsibility of King to provide safe working conditions was delegated to Nevils and Piserell, the foremen of the ironworkers. Under criteria No. 4 from the Canter case, quoted above, if the defendant's general responsibility has been delegated with due care to some responsible subordinate, the defendant is not personally liable for the negligent performance of this responsibility, unless he personally knows or should know of its nonperformance or malperformance and has nevertheless failed to cure the risk of harm.
In the present case, there is no question as to the use of due care in choosing the subordinates, Nevils and Piserell. There is not even a contention by plaintiff that either Nevils or Piserell were not qualified foremen. The jury found that both Nevils and Piserell were free of negligence.
*750 Furthermore, there is no evidence that either King or Tull had any personal knowledge whatever of the work actually being done by plaintiff at the time of the accident, or of the hazards incident thereto. Neither King nor Tull knew anything about this particular jack truss, or the fact that one of the points had to be forced. They did not know, and had no reason to know, that plaintiff had undertaken to perform a hazardous job from a very dangerous position. As will be discussed later, plaintiff was either sitting or squatting on the end of the jack truss which he was attempting to move.
We conclude there is no reasonable evidentiary basis for the finding by the jury that King and Tull were guilty of any personal (as contrasted with technical or vicarious) fault.
Plaintiff's principal argument is that ironworkers are normally subjected to serious hazards, and that this was a reasonably foreseeable type of accident. Plaintiff says that King and Tull should have foreseen the possibility of such an accident and should have provided safety belts or nets.
The first answer to the argument about the duty of King and Tull to furnish safety belts and nets is the same as that discussed above. Although it is true that the general contractor had delegated to King its general responsibility for providing safe working conditions, King had delegated this responsibility to competent subordinates. The evidence shows without question that both Nevils and Piserell were highly qualified and experienced as ironworker foremen. Nevils and Piserell both testified that King left it to them to provide for the safety of the ironworkers and that King provided everything that was requested. A particular example of the cooperation by King with the ironworkers, is that he furnished the floats. No request was ever made to King or Tull for safety belts or nets.
As regards safety belts, there is conflicting evidence as to whether they were available on the job. Plaintiff says he doesn't remember seeing any belts. Another ironworker, Claude Sensat, says he didn't remember seeing any on the job and didn't remember seeing anybody use such a belt. Oscar Stine, who was plaintiff's working partner, testified he didn't recall seeing any safety belts. Nevils said positively that safety belts were available and were hanging in the locker room. Piserell, who was plaintiff's foreman, testified that he had borrowed safety belts for the use of his men and that they were available.
However, regardless of this conflicting testimony as to whether safety belts were available on the job, the evidence shows conclusively that if Nevils or Piserell, or any of the other ironworkers, had requested safety belts, they would have been furnished. If, on the occasion in question here, plaintiff had asked for a safety belt, there is no question that Piserell would have supplied it. Piserell testified that he would have obtained a belt for any of his ironworkers who wanted one.
As regards nets, there is no testimony that nets were customarily used for this type of work. None of the witnesses who testified stated that they had ever seen nets used on this type of job. There was some mention of the use of nets on bridges or on multi-storied buildings, but there is no evidence to indicate that either King or Tull should have personally foreseen that nets should have been used on this job. And, of course, there is no evidence that there was any request made by any of the ironworkers or their foremen for nets.
The testimony of Oscar Stine, who was plaintiff's working partner, shows clearly that if any safety devices were needed they could have obtained them from Nevils or Piserell. This testimony also shows that neither King nor Tull had a personal duty to provide safety equipment to the ironworkers unless requested to do so. Stine testified:
"Q. As far as floats and this and that, anything you wanted out there, you *751 could always get, couldn't you sir? Upon request.
"A. Yes, sir.
"Q. Contact Mr. Piserell or Mr. Nevils, and what you needed you got.
"A. Yes, sir.
"Q. You didn't know Mr. Tull. While you saw Mr. King, you had no contact with him. They didn't interfere or get involved with the iron workers at all.
"A. No sir. They just talked to the foremen and stuff.
"Q. They didn't come around and mess around with your work, or any of the other iron workers as far as you're concerned?
"A. Not with me personally, sir.
"Q. Or anybody that you saw.
"A. Not anybody that I saw."

PLAINTIFF'S CONTRIBUTORY NEGLIGENCE
We find plaintiff's recovery must be denied also because of his own contributory negligence. Plaintiff himself had retrograde amnesia from head injuries and could not recall what happened just before the accident. Oscar Stine, the only eyewitness, testified that plaintiff was either sitting or kneeling on the jack truss that he was trying to pry into place. Plaintiff was holding a bull pin in one hand and a hammer in the other, so he was not using either hand to steady himself. This was an unusually hazardous way to accomplish the job. It was obvious that, if the jack truss suddenly went down under the lug and moved across, plaintiff might fall off. Oscar Stine testified that if he had been working on that particular point he would have worked from the stationary beam, rather than from the jack truss itself. The obvious reason is that the beam was solid and stationary and would not move when the jack truss moved. Stine also testified that ironworkers usually work in pairs on a difficult job and that this would have been a safer thing to do in this case.
There is a conflict in the testimony as to whether plaintiff should have used a float. Piserell testified that on the morning in question he ordered plaintiff and Stine to use a float. Plaintiff, because of his amnesia, doesn't remember this. Stine also testified he did not remember such instructions. There is also a conflict in the testimony as to whether even a float would have prevented plaintiff's fall if the beam moved as much as 18 inches. Stine testified that even if plaintiff had been standing or sitting on a float he would have probably been knocked off.
Nevertheless, regardless of whether plaintiff was ordered to use a float, or whether he should have used one, there is absolutely no contradiction to the testimony by Stine that plaintiff was either sitting or kneeling on the jack truss that he was trying to move, and that this was an unusually hazardous operation. Stine says he would have worked from the stationary beam and not from the jack truss. It is our view that Stine was clearly correct. Plaintiff was negligent in sitting or kneeling in this very precarious position on the jack truss, with a bull pin in one hand and a hammer in the other, while attempting to force the truss into place. It was obvious that if the truss suddenly moved, plaintiff might fall. Plaintiff did not use reasonable care for his own safety. He could have worked safely from the stationary beam. Stine knew this. There is no explanation as to why plaintiff should not also have known it.
For the reasons assigned, the judgment appealed is reversed and set aside. It is now ordered, adjudged and decreed that there be judgment herein in favor of the defendants appellants rejecting plaintiff's demands at his cost. All costs of this appeal are assessed against the plaintiff appellee.
Reversed and rendered.
*752 WATSON, J., dissents and assigns written reasons.
WATSON, Judge (concurring in part and dissenting in part):
After reviewing the lengthy record, I have concluded that I disagree with the result reached by the majority. I believe the reversal as to King, the project supervisor, is not in accord with the rules of Canter v. Koehring Co., 283 So.2d 716 (La.1973), and the recent expression of this court in Simmons v. Travelers Insurance Company, 295 So.2d 550 (La.App. 3 Cir. 1974), writs denied. However, as to Tull, the steel coordinator, I agree with the majority that the record does not support finding him liable.
Most significant in the consideration of this case is Art. 10, Sec. 10.2.5, of the contract between the City and the Joint Venture (King's employer). The majority has chosen to ignore entirely this provision of the contract which is vital to plaintiff's theory of the case and which supplies the personal duty held missing by the majority. This section states that a "responsible member of his organization at the site whose duty shall be the prevention of accidents" would be appointed by the Joint Venture and that this person would be the superintendent (King) unless otherwise designated in writing. This provision of the contract when considered with LSA-R.S. 23:13, the statute requiring employers to provide a safe place to work, puts the responsibility for safety squarely on King.
Under Canter v. Koehring Co., supra, there are four criteria for imposing individual liability on executive officers. These have been quoted by the majority. The first two are found by the majority to be met in the present appeal: (1) that the employer of King owed a duty to plaintiff; and (2) that the employer had delegated the duty to King. I agree with the majority that the duty was not delegated to Tull.
The majority finds that the third and fourth criteria of Canter are not met. In summary, the third would require that the defendant officer breached his duty through personal, rather than technical or vicarious, fault. The breach can be due to malfeasance, misfeasance, or nonfeasance including, "a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty." The fourth is that the officer have a personal duty rather than a general administrative responsibility and that it has not been delegated. The majority holds that King's duty had been delegated to two employees of the sub-contractor.
As to number three, the plaintiff contends that he was injured due to the failure of King to provide a safe place for him to work including failing to put a net under him and not furnishing a safety belt for him to wear. If there had been a net or a safety belt plaintiff would not have sustained the serious injuries resulting from his fall of some 50 or 60 feet. There is considerable evidence in the record concerning the use of safety belts, the use of nets, and the failure to furnish these. The jury saw and heard the witnesses, and drew what I believe to be reasonable inferences. Wiley v. Travelers Insurance Co., La.App., 300 So.2d 555. I cannot say that the jury was wrong in concluding that King was negligent in failing to provide these safety features on the job. I think that this failure was nonfeasance as contemplated in Canter, and also lack of ordinary care. After reading the record, I am convinced, as the jury may have been, that there was no one on the job who actually attended to safety. The record strongly suggests that the attitude was strictly "every man for himself". This is contrary to R.S. 23:13 and Judge Fruge's reasoning in Simmons.
The record even reflects the fact, probably not material but interesting nevertheless, that a large portion of the whole steel structure at the Civic Center fell down one afternoon, in an incident not connected to the instant case.
*753 As to the fourth Canter criterion, which basically involves the question of delegation of responsibility, I find no evidence that King delegated in writing (as the contract with the owner required) the safety responsibility to anyone. His was the responsibility under the contract and while the sub-contract points out that safety is of prime importance, the sub-contract does not purport to contract away King's responsibility for safety, if indeed it is possible under the law to do so. He could have appointed someone on the job as a safety director, but he did not. There is some rather vague evidence of a company safety man who came around once a month, but this evidence is certainly capable of a reasonable interpretation by the jury that there was no effective delegation of safety responsibility.
I strongly disagree with the majority's conclusion that the evidence shows "clearly" that the responsibility for safety was delegated to "responsible subordinates", namely Nevils and Piserell. These men worked for the sub-contractor and there is no written delegation of safety responsibility to these men or anyone else. The question of delegation of authority is largely factual; and I cannot find manifest error in the jury's conclusion.
King said that safety was not his responsibility, and Nevils and Piserell said that safety was the individual worker's responsibility. This approach seems to me to conflict with the legal principles of Simmons v. Travelers Insurance Company, 295 So.2d 550 (La.App. 3 Cir. 1974), writs denied.
As to the use of nets, it is interesting to note that King and Tull knew there were no nets: King said they were not necessary; and Tull said they were too expensive. There is a strongly disputed issue of fact as to whether there were safety belts; it is clear they were not required or worn. One defendant claimed that they had borrowed safety belts from Sonnier Electric; no witness from Sonnier was called to verify this contention.
The jury found King and Tull negligent. I would affirm their finding as to King, there being a reasonable evidentiary basis for this conclusion. Although quoting Canter on the scope of appellate review, the majority has not accorded, I fear, "great weight" to the findings of fact by the jury. When there is considerable evidence on both sides of factual issues, which, if believed, provides a reasonable evidentiary basis for conclusions by the trier of fact, the appellate court errs in substituting its judgment for that of the trial judge or the jury. Canter v. Koehring Co., supra; Wiley v. Travelers Insurance Co., supra; Reech v. Bodin, 286 So. 2d 477 (La.App. 1 Cir. 1973); Busby v. St. Paul Fire and Marine Insurance Co., 290 So.2d 701 (La.App. 1 Cir. 1974), writ denied.
As to contributory negligence, the jury found adversely to appellants' contention on this issue. One of the witnesses explained that plaintiff was left-handed and had to be on the truss to make the point. This explanation, which may have been believed and accepted by the jury is not mentioned by the majority. The case of Chaney v. Brupbacher, 242 So.2d 627 (La.App. 4 Cir. 1970), is particularly applicable to this situation. See also O'Keefe v. Warner, 288 So.2d 911 (La.App. 1 Cir. 1973), writ denied. It is a question of a man working in a situation which he knows to be dangerous, but he also knows that if he declines to work he will be paid off. Ironworkers are going to experience falls in this type of construction and I think that the jury reasonably concluded the negligence here was not that of the ironworker but was that of the project manager in not providing and requiring the use of safety equipment such as nets and safety belts.
Therefore, I respectfully concur in part and dissent in part.